FELIX F. STUMPF, FAUN DIXON, AND DONALD CARLSON, PETITIONERS, v. CHERYL A. LAU, IN HER CAPACITY AS SECRETARY OF STATE, RESPONDENT.

No. 23517

September 18, 1992                    839 P.2d 120

*Bible, Hoy, Trachok, Wadhams & Zive,* Reno; *Hamilton & Lynch,* Reno; *Richard E. Thornley,* Carson City; *John Calvin Jeffries, Jr.,* Charlottesville, Virginia, for Petitioners.

*Frankie Sue Del Papa,* Attorney General,. *Kateri Cavin,* Deputy Attorney General, Carson City, for Respondent.

*Susan Quig-Terry,* Las Vegas, for Nevadans for Term Limits.

## OPINION

By the Court, SPRINGER, Vice-Chief Justice:

On August 19, 1992, this court issued an alternative writ of mandamus to the Secretary of State ordering the Secretary either to remove from the November ballot an initiative proposal that seeks to place limits on the number of terms a United States Congressman or Senator from Nevada may serve, or show cause why the proposal should not be rejected.[1] The writ was issued on

---

[1]The initiative reads as follows:

TERM LIMITATIONS FOR FEDERAL OFFICE HOLDERS.

Section 1  This act may be cited as and referred to as, the "Term Limitation Act of 1992."

Section 2  Findings and declarations: The people of the State of Nevada hereby find and declare as follows:

Section 2.1  Federal representatives who remain in office for extended periods of time become preoccupied with their own reelection

three grounds. First, it appeared that if the initiative were approved by the voters, Nevada would be approving a law or an amendment of the state constitution that was violative of the United States Constitution and clearly beyond the powers of this state to enact. Second, it appeared that the initiative failed to gather sufficient valid signatures to qualify under the Nevada

and for that reason devote more effort to campaigning for their office than making legislative decisions for the good of the people of Nevada;

Section 2.2 Federal representatives have become too closely aligned with the special interest groups who provide contributions and support their reelection campaigns, provide special favors and intense lobbying, all of which causes [sic] corruption or the appearance of corruption of the legislative system;

Section 2.3 Entrenched incumbency has discouraged qualified citizens from seeking office and leads to a lack of competitiveness and a decline in robust debate on issues important to the people of Nevada;

Section 2.4 Due to the appearance of corruption and the lack of competitiveness for entrenched incumbency seats, there has been a reduction in voter participation which is counter-productive in a representative democracy;

Section 2.5 The people of the State of Nevada have determined that the declarations and findings contained herein threaten their vital interest in maintaining the integrity of their federal office holders and avoiding the appearance of corruption and lack of response to the needs of the people of Nevada. It is their purpose and intent in enacting this law that term limitation is the best method by which to insure that these vital interests are guarded for the people of the State.

Section 3 Notwithstanding any other provision of Nevada law, the Secretary of State or other authorized official, will not accept or certify a person's nomination petition, nor print or cause to be printed on any ballot or ballot label for the office specified, the name of any person, if any of the following shall occur:

Section 3.1 The person who by the end of the current term of office will have served, or but for resigntion, would have served as a representative from Nevada to the United States House of Representatives for six (6) or more years in any twelve (12) year period of time, except that, any time served in the United States House of Representatives, prior to January 1, 1995, shall not be counted for purpose [sic] of this term limit.

Section 3.2 The person who by the end of the current term of office will have served, or but for resignation, would have served as a representative from Nevada to the United States Senate for twelve (12) or more years in any twenty-four (24) year period, except that, any time served in the United States Senate, prior to January 1, 1995, shall not be counted for purposes of this term limit.

Section 4 The term limit set forth in Section 3 above shall apply only to the specific office referenced in which the person previously served. It is not the intent that this act preclude or prohibit a person from seeking nomination or election to any other office for which the referenced term limits are not applicable.

Section 5 If any part of this measure or the application to any person or circumstance is held invalid, the invalidity shall not affect other provisions or application, [sic] which reasonably can be given effect without the invalid provision or applications.

Constitution for placement on the ballot. Third, it appeared that the initiative was so poorly drafted that signers of the initiative petition were not advised as to whether they were seeking enactment of a law or an amendment to the Nevada Constitution. Mandamus is the proper remedy in such controversies. *See, e.g.,* Lundberg v. Koontz, 82 Nev. 360, 418 P.2d 808 (1966) (in challenge to legal sufficiency of an initiative petition this court issued an alternative writ of mandamus which the court later made permanent).

After examining the written responses to the mandamus petition and listening to the oral arguments of counsel, the true nature of this initiative effort began to unfold: the initiative was designed not to change the law or the constitution but to let the people "express themselves" in what would amount to a straw poll or statement of public opinion on the question of how many voters favored or disfavored changes in the terms of our United States Senators and Congressmen. We heard no serious argument claiming that the people of this state, through the initiative process provided for in our state constitution, had the power to interfere with the qualifications and terms limits of federal office holders. We received no acceptable explanation of how an initiative petition could bring about an amendment of the Nevada Constitution when the initiative did not mention the Nevada Constitution or even the word, "amend." The insufficiency in the number of valid signatures that appears from the record before us was not cogently argued on the merits but, rather, was dismissed with the argument that only a trial court could deal with such factual matters. Counsel for the Secretary of State argued that the mere fact that the initiative might be unlawful is not enough to disqualify the petition. Counsel for the initiative petitioners argued that people have the right to propose an idea; and if they have enough signatures, they have the right to vote on it. Even one of this court's justices wondered if it might not be proper to allow the matter on the ballot just so the people would "be able to express their views." This, then, is the real question: Should this court reject a proper challenge to the initiative process and thereby approve a statewide balloting whose only purpose is to allow the people to express their views, when all concerned appear to recognize that voter approval would enact a proposition that was contrary to the Constitution of the United States and would not have any legal force or effect? We answer the question in the negative and hold, as we did in Caine v. Robbins, 61 Nev. 416, 131 P.2d 516 (1942), that

[i]f a proposed amendment to the state Constitution by its

terms specifically and necessarily violates a command or limitation of the Federal Constitution, . . . the prescribed legal procedure for submitting such a proposed amendment to the electorate . . . may be enjoined at the suit of proper parties in order to avoid the expense of submission, when the amendment, if adopted, would palpably violate the paramount law and would inevitably be futile and nugatory and incapable of being made operative under any conditions and circumstances.

*Id.* at 425, 131 P.2d at 519 (quoting Gray v. Winthrop, 156, So. 270, 272 (Fla. 1934)).

## I.

### *Violation of the Paramount Law*

Opponents to the mandamus petition now before us made little or no argument urging that the people of this state have the power to alter the qualifications or terms limits of federal offices created by the Constitution of the United States. Not even Congress has the power to alter qualifications for these federal constitutional officers. *See* Powell v. McCormack, 395 U.S. 486 (1969). As this court noted in State ex rel. Santini v. Swackhamer, 90 Nev. 153, 155, 521 P.2d 568, 569 (1974) (quoting 1 Story on the Constitution, (5th Ed. § 627)), "[t]hose officers owe their existence and functions to the united voice of the whole, not of a portion of the people." Further, as Justice Story has observed, "the States can exercise no powers whatsoever which exclusively spring out of the existence of the national government . . . ." *Id.* Thus, the initiative petition, whether it enacts a law or amends the state constitution, can have no effect on the terms of members of the United States Congress.

This point need not be overly belabored. The term limits initiative clearly and "palpably" violates the qualifications clauses of Article I of the United States Constitution.[2] No case authority has been offered in support of the novel proposition that this or any state has the power to impose qualifications for federal office provided for in the United States Constitution. Again, the only question is whether, under these circumstances, the people should vote on a moot issue.[3]

[2]*See* U.S. Const. art I, § 2, cl. 2; U.S. Const. art. I, § 3, cl. 3.

[3]The dissent suggests that our decision will disenfranchise the voters and prevent them from participating in a groundswell of support for federal term limits. No citizen has a right to participate in a "straw poll" on an amendment to the State Constitution that clearly violates the United States Constitu-

Citing our recent decision in Las Vegas Chamber of Commerce v. Del Papa, 106 Nev. 910, 802 P.2d 1280 (1990), respondent and the Nevadans for Term Limits ("NTL") contend that this court should decline to determine whether the federal term limits initiative violates the United States Constitution. Our decision in *Las Vegas Chamber of Commerce,* however, did not overrule our holding in *Caine,* a holding which has "remained inviolate in an unbroken line of cases that has stood for almost fifty years." *Las Vegas Chamber of Commerce,* 106 Nev. at 916, 802 P.2d at 1281. To the contrary, this court twice cited *Caine* with approval in the *Las Vegas Chamber of Commerce* case. *Caine* stands today and has stood ever since its issuance in 1942 for the proposition that a ballot question may be enjoined by this court where the question, if enacted, would constitute a "plain and palpable" violation of the United States Constitution and would "inevitably be futile and nugatory and incapable of being made operative under any conditions or circumstances." *Id.* at 425, 137 P.2d at 519 (quoting Gray v. Winthrop, 156 So. 272 (Fla. 1934)). *See also* Advisory Opinion to the Atty. Gen., 592 So.2d 225, 229 (Fla. 1991) (Overton, J., dissenting in part and concurring in part).

In *Las Vegas Chamber of Commerce,* this court addressed a ballot question that arguably might have been applied in a constitutional manner. Unlike the ballot question at issue in *Las Vegas Chamber of Commerce,* the ballot question in the instant case falls squarely into the category of initiative measures defined in *Caine* which are subject to removal by this court. The question here cannot be implemented in a constitutional manner, and we envision no political utility in burdening an already strapped public fisc with the expense that would inevitably be incurred by placing a meaningless question on the ballot, conducting the election, and tallying the votes. As we noted in *Caine:*

> To deny the jurisdiction of courts in a case of this character, where a plain, palpable violation of the constitution is threatened, would be to concede that irreparable injury, obvious and undisputed, was beyond the restraint of the remedial arm of equity.

*Id.* at 427, 131 P.2d at 520.

tion. When a proposal is obviously unconstitutional, permitting a vote on the matter will lead only to the creation of false hope and, if passed, eventual anger and disillusionment when the measure is declared unconstitutional. It is far better to "bite the bullet" now, strike the measure from the ballot, and avoid the expense and any false expectations for the proposal.

## II

*Failure of Initiative to Define Nature or Purpose
of Proposed Enactment*

As a justice of this court commented at the time of oral argument, "The word *constitution* does not appear," in the initiative petition. There is nothing that would prevent the Secretary of State from drafting the initiative petition's proposals as a statutory enactment rather than as a constitutional amendment. The potential signers certainly were given no indication on the form that they signed that they were urging such momentous action as amending our state constitution. The Nevada Constitution is the fundamental law of our state, and if it is to be amended by an initiative, "potential signers are to be made specifically aware of the solemnity of their act in signing that they may do so with full appreciation of the fact that they are participating in an effort to change the fundamental law, *i.e.*, the constitution of their state." State ex rel. Scott v. Kirkpatrick, 484 S.W.2d 161, 164 (Mo. 1972). In *Scott,* the Missouri State Constitution required the enacting clause in an initiative to state that the constitution would be amended. Our constitution requires that there be an enacting clause stating: "The People of the State of Nevada do enact as follows[]." Nev. Const. art. 19, § 3(1). When a constitutional amendment is being proposed, one would expect to find, after recital of the required enacting clause, some kind of proposal or declaration that the *constitution* was being amended, thus: "The People of the State of Nevada do enact as follows: The Constitution of Nevada, Article ......, Section ......, is hereby amended to read as follows: '.......'" Without language specifying whether the initiative is intended to create a law, amend a law or amend the constitution, the Secretary of State has no guidance as to how the ballot proposition is to be drafted. This failure to specify the nature and purpose of the initiative is not merely an obscurity of language; it is a fatal omission that effectively prevents the signers from knowing what they are signing. If initiative petition signers are petitioning for enactment of a state law, the petition should state that law enactment is what the petition is about. If the petition signers are going further and seeking to amend the state constitution, certainly they should say this in their petition and not leave the choice up to the Secretary of State. The idea that all a petition for initiative must contain is a loose collection of ideas that can be crafted into legislative or constitutional form by the Secretary of State is contrary to the basic nature of the initiative process. Article 19, section 2(1) of the Nevada Constitution gives to the people "the power to propose . . . amendments to this

constitution . . . ." If the people are going to *propose* an amendment to the constitution, they must propose an amendment *as* an amendment to the constitution and not as a mere law nor as a loosely worded aggregate of ideas and philosophical ruminations. The initiative petition before us is not even ambiguous. It refers to a law, an *act,* not a constitutional amendment. ("This *act* may be cited and referred to as the 'Term Limitation Act of 1992.'" (Emphasis added.)) It is not difficult to find case authority for the proposition that an initiative petition signer must be informed at the time of signing of the nature and effect of that which is *proposed.* "Failure to so inform the signatories and voters is deceptive and misleading, and therefore the Petition is invalid." In re Initiative Petition No. 344, 797 P.2d 326, 330 (Okla. 1990). "We cannot assume that people are indifferent whether they are asked to approve an ordinary law or to amend their constitution." Oregon State Homeowner's Ass'n v. Roberts, 703 P.2d 954, 955 (Or. 1985).

Our constitution is too sacred a document to be amended by way of an initiative petition that does not mention the constitution and which is framed in terms of an ordinary law, an *Act.* The initiative petition clearly must fail on this ground alone.

### III

*Insufficiency of Signatures*

With regard to the petitions from two counties, Carson City and Lyon County (or "Lion County" as it appears in the answer filed by Nevadans for Term Limits), it is clear from the record before us that these petitions cannot qualify.

In Carson City, one William Elton Harvey circulated documents 73 through 82. On May 9, 1992, Harvey signed each document in the space provided. On each of the documents were also Harvey's validating affidavit sworn to on May 9, 1992. On May 9, 1992, when he signed the petition documents and the affidavits, he was not a registered voter. If because of Harvey's ineligibility to execute the validating affidavits these documents are not valid, the petition fails in Carson City.

In Lyon County, one Jeanette B. Smith circulated a twenty-five-signature document which she signed on May 28, 1992. On May 28, 1992, however, she was not a registered voter. If the twenty-five-signature document is not valid, the petition fails in Lyon County. If Lyon County and Carson City do not qualify, the whole initiative fails.

The question is a very simple one: Is one who is not a registered voter at the time he or she signs the petition empowered to sign the validating affidavit required by article 19, section

3 of the Nevada Constitution? The answer is clearly, "no," and since these documents do not contain the required affidavit, they must be discarded.

Article 19, section 3(1) of the Nevada Constitution requires that "each signer" of an initiative petition must affix the signature, residence address and "the county in which he or she is a registered voter." The constitution goes on to provide that "each document" of the petition must have an affidavit "made by one of the *signers of such document* . . . ." (Emphasis added.) The necessary and indispensable *affidavit* must say that (1) all of the signatures are genuine and (2) "that each individual who signed such document *was at the time of signing* a registered voter . . . ." (Emphasis added.) Because Ms. Smith in Lyon County and Mr. Harvey in Carson City *were not registered voters at the time that* they signed the petition, they clearly were not *signers* as defined by the Nevada Constitution. Only registered voters can be signers; and since they were not registered voters at the time, they could not be signers. The validating affidavit on each document must be "made by one of the signers of the document." It is a legal impossibility for either Ms. Smith or Mr. Harvey to have been a "signer" at the time they put their signatures to the documents in question; hence, they were not qualified under our constitution to execute the validating affidavit that is required by the constitution. There can be no argument about this. This is not a matter of appellate fact-finding. This is not a matter that need be sent back to the trial court for hearing. The record is plain. No one has suggested that the signers of the subject affidavits were in fact registered voters at the time they signed the petition documents and were thus qualified to make the validating affidavit.

There is no way on the record as it now stands that the initiative petition can be said to have the required number of valid signatures. It may be stricken from the ballot on this ground alone.[4]

## IV.

### Conclusion

As JUSTICE STEFFEN pointed out at oral argument, the obvious and proper way of going about effecting changes in the terms of federal constitutional officers is to amend the Constitution of the

---

[4]There are a fairly large number of other jurisdictional defects which probably would be established where time available. The petition effort appears to have been conducted by mercenaries from outside of the state. A number of petitions fail to state the proper date or to state the county name. One petition document in Washoe County contains an unsigned affidavit which was nonetheless notarized as having been "[s]ubscribed to before [the notary]." Since the deficiencies in Carson City and Lyon County are so apparent and indisputable, we do not give further consideration to the remaining defects.

United States. Obviously, the people of this state, either by ordinary act or by constitutional amendment adopted through the initiative process, are not empowered to intrude into this clearly federal ground. It is also apparent that the initiative petition now before us is totally ineffective as an instrument of constitutional amendment; and, finally, the petition has an insufficient number of valid signatures. Still, we hear the cry that we should ignore all of this and let the matter go on the ballot "just to see what would happen." Those who make this idle demand should reflect upon the consequences of this court's falling away from its clear duty to interpret and enforce the law. Must those who are right, those who have come to us to tell us correctly that this proceeding is constitutionally insupportable under either the Nevada or the United States Constitution, be turned away, while we rule in favor of those who want us to let an almost admittedly ineffective initiative proceeding take its course through the elective process? We need not calculate or estimate the cost of playing such games to predict that necessarily either side of this issue will be expected to expend substantial funds on political advertising and considerable human energy in furthering one side of this issue or the other. It is interesting to speculate as to just *when* those who urge that this proposition remain on the ballot would wish us to perform our judicial duties if we do not perform them now. It is, of course, possible that the measure would fail in one of the elections. This would diminish the amount of unnecessary mischief brought about by our failure to exercise our judicial duties in a timely way, depending, of course, on when the measure failed. If the measure were to fail on the second ballot, it is certain that large sums of money and human resources would have been expended in the first balloting for advancing either side of this invalid proposition. The most harm would be done, however, if the measure passed in two elections, and this court were then asked in some later legal maneuver to tell the voters that their vote was of no effect and that we knew all along that they were voting on a measure that was contrary to the provisions of the United States Constitution, and was based on an invalid petition that had been worded and circulated in a manner that did not conform to the Nevada Constitution. Were we, at a later date, after the voters had twice approved the measure, to declare that the term limit proposition was, just as its proponents suggest, merely a straw poll and of no legal force or effect, the people of this state would be understandably and justifiably outraged and enraged at such irresponsibility on the part of the highest court in this state. As put by the Oklahoma Supreme Court last month when it removed an initiative question from the ballot because it would have, if enacted, violated the United States Constitution:

"It would be a disservice to the proponents, to the protestants, and to the state's citizens to hold an election that could not withstand the immediate . . . challenge that would be bound to follow." *See* In re Initiative Petition No. 349, 838 P.2d 1.

The proposed Term Limitation *Act,* as it is called, cannot be allowed to stay on the ballot. Elections in this state are not games or straw polls. If the initiative attempt must fail, it must fail now and not after public and private time, money and energy have been expended in the political process. We would be shirking our duty indeed if we failed to act in this manner now. The writ is made permanent; the Secretary of State is ordered to remove the matter from the ballot.

ROSE, J., and HANDELSMAN, D. J.[5] concur.

STEFFEN, J., with whom YOUNG, J., joins, dissenting:

The majority has hastily painted a picture highlighting the blemishes on the challenged initiative (hereafter "initiative" or "Question 7"). Unfortunately, the majority's preoccupation with the blemishes seems to have obscured what I believe to be the more comely part of the picture. Discussing perspective has little value, however, as the metaphoric picture to which I make reference has the force of law behind it that disenfranchises the right of Nevada's citizens to participate in the completion of the painting. Casting aside this court's tribute to the value of public sentiment, Las Vegas Chamber of Commerce v. Del Papa, 106 Nev. 910, 802 P.2d 1280 (1990), the majority hastens to resolve highly complex issues of first impression to create a foundation for issuing a discretionary writ enjoining a public vote on a subject of great current interest in this nation. My basis for dissenting has far more to do with the timing and the scope of the majority opinion than it does with its analysis of the defects in the initiative and the prospects for the initiative's constitutional validity if it were to succeed as an amendment to the Nevada Constitution. The majority, not unreasonably convinced that passage of Question 7 would provide but a fleeting victory to be dashed by a subsequent challenge in the courts, has elected to spare the electorate the possible frustration of being advised that they have voted in vain. For reasons I shall endeavor to express hereafter, I

---

[5]THE HONORABLE JOHN MOWBRAY, Chief Justice, voluntarily recused himself from participation in the decision of this matter. The Honorable Mark Handelsman, Judge of the Second Judicial District Court, was therefore designated by the Governor to sit on this case, and has participated in its decision after full review of all briefs, the record, the exhibits and the recording of the oral argument heretofore heard by the court. Nev. Const. art. 6, § 4.

believe that, from the voters' standpoint, it is "far better to have spoken and lost, than to have never spoken at all."

I suggest initially, that stare decisis demands that this court ask and answer in a legally defensible way at least one threshold question before reaching the merits of petitioners' federal constitutional arguments. In Caine v. Robbins, 61 Nev. 416, 131 P.2d 516 (1942), this court held that a proposed amendment to the state constitution *"may* be enjoined" (emphasis added) where the question, if enacted, would constitute a plain and palpable violation of the United States Constitution and would "inevitably be futile and nugatory and incapable of being made operative under any conditions or circumstances." *Id.* at 425, 137 P.2d at 519 (quoting Gray v. Winthrop, 156 So. 270, 272 (Fla. 1934)). I emphasize the discretionary word "may" because it is clear that even where this court is convinced that an initiative is fatally endowed with unconstitutionality, we may nevertheless choose not to interfere in the process of public expression.

Less than two years ago this court announced:

> [E]ven if an initiative measure is unconstitutional, there is great political utility in allowing the people to vote on the measure. Such a vote communicates clearly to the representative branches of government the popular sentiment on a particular issue or issues.

*See* Las Vegas Chamber of Commerce v. Del Papa, 106 Nev. 910, 917, 802 P.2d 1280, 1282 (1990). Thus, while simultaneously reaffirming the vitality of *Caine,* we proceeded in *Las Vegas Chamber of Commerce* to recognize a predominate value in public expression *even if an initiative measure is unconstitutional.* In brief, *Las Vegas Chamber of Commerce* represented a policy decision by this court that our decision to intervene in such matters should be strongly tempered by deference to the people's right to express themselves through the ballot. Stated otherwise, *Las Vegas Chamber of Commerce* emphasizes in unmistakable terms this court's recognition of the guarantees of freedom of expression and the right to vote as among the most cherished rights conferred by the constitution. In light of our ruling in *Las Vegas Chamber of Commerce,* the threshold question now should be, why should this court hastily exercise its discretion in order to deprive Nevada voters of the right of expression that we found to be so significant and compelling in *Las Vegas Chamber of Commerce?*

This matter came to this court slightly less than one month ago. Orderly and measured appellate consideration of the issues presented by the parties has been severely constrained by the need to allot adequate time to election officials to carry out their statutory

duties and to prepare and disseminate the general election ballots to resident and absentee voters. *See* NRS 293.253; 293.309. We have been required to employ expedited procedures in an effort to accelerate resolution of the merits of this matter and in order to prevent significant disruption to the election process. We have been equally pressed by the demands of the oral argument calendar and the time limitations resulting therefrom. Thus, in the abbreviated period devoted to briefing, research, argument, and deliberation, neither the parties nor this court have been able to provide exhaustive efforts to the resolution of the intricate and complex issues presented. Under similar circumstances, this court has in the past declared that it would decline to determine the merits of a ballot election challenge. *See* Beebe v. Koontz, 72 Nev. 247, 302 P.2d 486 (1956). Our holding in *Las Vegas Chamber of Commerce* also recognizes the reality that federal constitutional questions are simply too important and complex to resolve in haste, without careful and measured consideration.

The majority concludes that there is no utility in facilitating the needless expenditure of money and other resources in campaigning for and against the measure before us. I remind my colleagues, however, that untold lives and fortunes have been expended in defense of the right to advance ideas and concepts in free elections—a right so cherished that it may not be valued in terms of monetary cost. On the basis of this argument alone, and without due and careful deliberation, I am not prepared to cast aside established precedent reflecting a policy of deference to that fundamental right.

I do not suggest that our established precedents should never be subject to limitation and revision. To the contrary, there may be valid and persuasive reasons to revisit and reexamine our prior holdings. Prior to interdicting the foremost rights of the people, however, due regard for the concept of stare decisis demands that this court devote adequate time to undertake the research and careful consideration necessary to analyze our precedents in cautious, principled, and deliberate manner.

As the majority observes, it is beyond cavil that no single state may supersede, amend or qualify any provision of the United States Constitution. With all due respect, however, I am not prepared to state with absolute assurance that resolution of the questions presented is susceptible to such a superficial and facile analysis. Recently, the Supreme Judicial Court of Massachusetts was faced with the identical federal constitutional issues now before this court. With understandable restraint, the Massachusetts court observed:

> The United States constitutional issues presented . . . in addition to being highly complex, are ones which have not as

yet been considered, in any respect, by the United States Supreme Court or by Federal trial or appellate courts. In fact, only one State appellate court has reported a decision regarding the question of political term limitations, and that court declined to formulate an opinion on the Federal issues involved. *See* Advisory Opinion to the Attorney Gen., 592 So.2d 225 (Fla. 1991). Therefore, for this court to address the questions posed by the Senate regarding the constitutionality of the initiative under the United States Constitution we would have to predict the view the Supreme Court ultimately would take on the issue of Federal term limitations, speculating as well as to the basis on which the Justices would rely to support that view.

*See* Opinion of the Justices to the Senate, 595 N.E.2d 292, 302 (Mass. 1992). If this court is to be the first to confront the constitutionality of state-imposed federal term limits, it should devote more than mere passing, superficial consideration of the Constitution's text, structure and history, as well as the Supreme Court decisions that bear on the question. *See* Troy Andrew Eid and Jim Kolbe, *The New Anti-Federalism: The Constitutionality of State-Imposed Limits on Congressional Terms of Office,* 69 Denv. U. L. Rev. 1, 5 (1992).

It is at least arguable that the federal term limits measure could be viewed by the United States Supreme Court as constitutionally valid. By way of illustration, I set forth below a number of questions which lurk below the surface of petitioners' claims which would seem to require an informed and careful analysis prior to reaching any conclusions concerning the position that will eventually and inevitably be taken by the final arbiter of the subject (absent a constitutional amendment), the United States Supreme Court.

Consideration of the express text of the United States Constitution gives rise to a number of complex questions that demand in-depth analysis. Nowhere in that document is it expressly provided that the states are precluded from imposing conditions on the election of federal legislators. To the contrary, the constitution expressly provides that members of the United States House of Representatives are to be *"chosen . . . by the People of the several states,"* and that "the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." *See* U.S. Const. art. I, § 2, cl. 1 (emphasis added). Similarly, the Senators from the respective states are to be *"elected by the people thereof . . ."* and "[t]he electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures." *See* U.S. Const. amend. XVII. Perhaps a state constitutional

limitation of federal congressional terms can be considered as merely one way in which the people of the respective states are permitted to chose their representatives. *See* Roderick M. Hills, Jr., *A Defense of State Constitutional Limits on Federal Congressional Terms,* 53 U. Pitt. L. Rev. 97, 107 (1991). Further, it has been argued that, in expressly conferring upon the "people" of the respective states the right to "choose" and "elect" their representatives and senators, the framers may also have intended to reserve directly to the people, as opposed to the federal or state legislatures, the right to enact, through the initiative process, state constitutional provisions adding reasonable qualifications beyond those specified in the qualifications clauses. *Id.*

The Ninth Amendment to the United States Constitution provides that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." In the proper performance of our duties, this court should at least take time to reflect on the history and meaning of these amendments to consider whether they may support a conclusion that the qualifications clauses merely establish a "floor" below which the states may not go. Certainly, it can be argued that the constitution's broad grant of authority to the states to determine who shall vote in congressional elections might imply that the people of the respective states also possess the power to provide in their state constitutions qualifications or conditions for election as a federal legislator. *See* Roderick M. Hills, Jr., *A Defense of State Constitutional Limits on Federal Congressional Terms,* 53 U. Pitt. L. Rev. 97 (1991).

Provisions in our own constitution, for example, mandate that "[n]o person shall be eligible to any office who is not a qualified elector under this constitution" and that no person may be an elector "who has been or may be convicted of treason or felony in any state . . . unless restored to civil rights . . . ." *See* Nev. Const. art. 15, § 3; Nev. Const. art. 2, § 1. Can we say with certainty that there is no reason to the argument that such provisions merely operate as state imposed "limitations" on candidates for public office, including the federal congress, rather than additional qualifications beyond those of age, residency and citizenship contained in the qualifications clauses? In other words, if a state may constitutionally deny a place on the ballot to a convicted felon, thus effectively precluding his election as a federal legislator, perhaps a state could also limit ballot access for federal office to those who have not already served in such office for a period of time specified by state law. After all, the United

States Supreme Court has validated some forms of state-imposed restrictions denying access to the ballot. *See* Jenness v. Fortson, 403 U.S. 431 (1971) (Georgia regulation barring independent candidates who fail to collect signatures of five percent of the electorate from ballot held to be a valid election regulation); Storer v. Brown, 415 U.S. 724 (1974) (California restriction denying access to ballot to independent candidates who had formerly registered with political party within preceding year held to be valid election regulation).

I do not suggest affirmative answers to such questions. Nor do I suggest that exhaustive research validates the questions. I do suggest, however, that if it is determined that the constitutional issues need to be decided, there is wisdom in taking the time to see that necessary questions are asked and that sufficient research is undertaken to provide incisive answers before any conclusion respecting the constitutionality of Question 7 can be stated with confidence.

With adequate time, there is little doubt that a thorough examination of other traditional sources of constitutional history would enlighten and inform this court's consideration of the issues presented. The cursory research thus far completed by this court indicates that the records of the Constitutional Convention of 1787, the writings of Madison and Hamilton contained in the Federalist Papers, and the writings of the Anti-Federalist pamphleteer Cincinnatus all provide useful insight into the intent of the framers with respect to the questions before us.

A focused review of the history of certain Congressional actions would also seem to be in order. Both the House of Representatives and the Senate have had occasion to address election contests involving alleged violations of state-imposed requirements. *See* Roderick M. Hills, Jr., *A Defense of State Constitutional Limits on Federal Congressional Terms,* 53 U. Pitt. L. Rev. 97, 128 (1991). The light in which Congress itself views the import of state-imposed regulations on its members should at least be reviewed.

I note as well that NTL contends that the thirteen-county requirement mandated in article 19, § 2(2) of the Nevada Constitution is violative of the one person, one vote principle of the First and Fourteenth Amendments to the United States Constitution. NTL argues that such a requirement unconstitutionally provides the less populous counties with a veto power over initiatives supported by the more populous counties. *See generally* Moore v. Ogilvie, 394 U.S. 814 (1969). Such contentions are of precisely the type which we declined to reach in Las Vegas Chamber of Commerce v. Del Papa, 106 Nev. 910, 917, 802 P.2d 1280, 1282 (1990). They are simply not reasonably suscep-

tible to resolution by resort to accelerated and summary procedures without time for adequate briefing, argument, research and deliberation.

Although I entertain serious doubts respecting the constitutional validity of the ballot question in issue, due to the imperatives of haste and the complexity of the issues, those doubts have not as yet attained that measure of certitude which would permit me to conclude confidently that the initiative is plainly and palpably unconstitutional. *See* Caine v. Robbins, 61 Nev. 416, 427, 131 P.2d 516, 520 (1942).

Moreover, I suggest that proper appellate procedure would question the necessity or wisdom of reaching the constitutional issues and rushing to be at the forefront of a concern that has yet to be addressed by any of the federal courts. In cases too numerous to list, this court has repeatedly held that it will not consider constitutional issues that are unnecessary to the court's determination of the case. *See, e.g.,* Spears v. Spears, 95 Nev. 416, 596 P.2d 210 (1979); Union Pacific R.R. Co. v. Adams, 77 Nev. 282, 362 P.2d 450 (1961); State v. Curler, 26 Nev. 347, 67 P. 1075 (1902). Where, as here, the majority confidently decides that the initiative violates Nevada law, there is simply no basis for reaching issues involving the federal constitution.

Turning to petitioners' claims relating to the validity of the initiative petition documents, it is at least safe to say that the validity of the documents is problematic. It is also clear that issues surrounding validity include not only challenges to the legality of the language or clarity of the initiative, but also fact intensive problems regarding the validity of signatures. For the most part, petitioners have requested this court to resolve these factual issues on the basis of conflicting affidavits. Ordinarily, of course, an appellate court is not an appropriate forum in which to resolve disputed questions of fact. *See* Round Hill Gen. Imp. Dist. v. Newman, 97 Nev. 601, 637 P.2d 534 (1981). When disputed factual issues are critical to the proper resolution of a request for extraordinary relief, the writ should be sought in the first instance in the district court, with appeal from an adverse judgment to this court. *Id.* The time constraints applicable here, however, have foreclosed such an orderly and traditional fact-finding process.

It is true that some of the critical facts petitioners have sought to establish by way of affidavits remain uncontroverted. I nevertheless find it difficult to resolve many of these matters with certainty, given the minimal time limits under which the respondent, the initiative proponents, and this court were forced to proceed. And where it is alleged that technical deficiencies render the petition documents a few signatures short of the required

number, I suggest that doubts concerning such technicalities should be resolved in favor of the people's right to express themselves through the ballot process.

Although disqualifying shortages may exist in one or more counties, we were informed on the eve of oral argument that it has now been determined that signatures previously thought to have been invalid in White Pine County may have now been validated in sufficient numbers to qualify that county for inclusion among the counties that have met the requirements for a valid initiative. Moreover, allegations of deficiency concerning Carson City were raised on the eve of oral argument, and the Secretary of State and NTL had no opportunity to review and refute those allegations. I do not purport to know what the facts may eventually show concerning the various contentions of technical invalidity in certain of the petition documents, but I would most certainly not decide the issues precipitantly in order to prevent our citizens from voting on Question 7.

During oral argument I expressed my concerns regarding the fact that the initiative language made no reference to the measure as an intended means of amending our state constitution. In truth, the language facially suggests an initiative designed to produce a state statute. Although my concerns remain, and the issue is significant, a lingering question prevents me from prematurely accepting the disqualifying conclusion reached by my brethren in the majority. May the lack of clarity be cured by definitive ballot language supplied by the Secretary of State? It seems clear that if the intendments of the initiative are clearly set forth on the ballot, voters will not be misled as they cast their votes on the subject. I respect the fact that an affirmative answer to the question posed could be viewed as a major step in the direction of rendering the formal initiative process unacceptably lax. I emphasize again, however, that in asking the question, I suggest neither the answer nor the validity of the question. I merely underscore the wisdom of those courts that have exercised restraint in favor of the voters rather than disqualifying technicalities.

In my view, where, as here, severe time constraints prevent this court's resolution of complex issues without significant disruptions to the election process, any doubts respecting the validity of a proposed initiative should be resolved in favor of allowing the measure to go before the voters. Two centuries of successful democracy in this country amply justify an abiding faith in the wisdom of the electorate to determine such matters in the first instance. *See, e.g.,* Las Vegas Chamber of Commerce v. Del Papa, 106 Nev. 910, 917, 802 P.2d 1280, 1282 (1990) (even if an initiative measure is unconstitutional, there is great utility in allowing the people to vote on the measure; such a vote communi-

cates clearly to the representative branches of government the popular sentiment on a particular issue). Accordingly, I would decline to resolve at this time the merits of the factual and legal issues presented.

Nonetheless, as justices we cannot ignore our obligation to protect and defend the paramount law of the nation and of this state. If our citizens had been allowed to vote on Question 7, due regard for our obligation and the electorate would have mandated that the voters of this state be forthrightly apprised of the strong possibility that a public vote in favor of Question 7 may ultimately be declared invalid in future judicial proceedings. Accordingly, I would have had this court direct the Secretary of State to include the following language in the ballot question arguments formulated, pursuant to NRS 293.250(5), both for and against passage of Question 7:

> The Nevada Supreme Court has expressed strong concern about the validity of Question 7 under both the Nevada State Constitution and the United States Constitution. Voters are cautioned that their vote for or against this measure may ultimately have value only as an expression of public sentiment on the subject.

Such a cautionary instruction regarding the constitutionality of Question 7 would serve to dispel any false expectations among voters who support such restrictions and would encourage term limit advocates and opponents alike to weigh the prospects of an eventual ruling of invalidity as they plan their efforts and expenditures on the measure.

## CONCLUSION

I have carefully avoided irrelevant inferences concerning the merits of term limitations on federal legislators. This court has no legitimate interest in the wisdom of the proposed measure, and would indeed be presumptuous to assume that its members possess greater insights on the subject than our voting citizens. Rather, my major concerns have focused on the fundamental right of our citizens to access the ballot. The Secretary of State has determined that 32,853 Nevadans have requested that federal term limits be placed before the people on the November 1992 general election ballot. My colleagues in the majority speculate that the signatures were induced by "mercenaries." I am far more interested in the fact that such large numbers of our citizens have indicated a desire to have the measure placed on the ballot than I am the citizenship of those who labored in the initiative process.

This court was faced with two basic alternatives: the exercise

of its discretion to precipitantly exalt technicalities over the predominate right of public sentiment recognized by this court in *Las Vegas Chamber of Commerce* or the exercise of its discretion in favor of the public right to communicate "clearly to the representative branches of government the popular sentiment on a particular issue or issues." *Las Vegas Chamber of Commerce,* 106 Nev. at 917, 802 P.2d at 1282. Nevada's voice will not be heard among the numerous states that will be voting on federal congressional term limitations this year. I do not fault the bona fides of my colleagues and recognize that many will respect their willingness to take a stand now rather than later. My position, however, is simple. Time constraints have summoned haste in deciding complex issues of great importance that, under this court's precedents, should have remained undecided or delayed in favor of contemplative thoroughness and allowing a public vote on Question 7. This nation has achieved greatness by promoting and protecting free expression—the world of ideas. Whether the idea of federal term limitations moves to a crescendo capable of producing an amendment to the United States Constitution, a favorable or adverse decision by the United States Supreme Court, or simply withers on the vine, our federal society will have been enriched by the discourse. It is unfortunate that the views of Nevadans will not be part of the enriching process, at least during this moment in our nation's history.

For the reasons abbreviated above, I would deny the relief requested in the instant petition, and vacate our prior order of August 19, 1992, granting an alternative writ and imposing a stay. Further, I would direct the clerk of this court to issue a writ of mandamus directing the Secretary of State to include the aforementioned cautionary language in the arguments presented on the ballot both for and against passage of Question 7, and let our people vote.