881 P.2d 281 (1994)
WYOMING NATIONAL ABORTION RIGHTS ACTION LEAGUE; Wyoming National Organization for Women; Jane Courage; Dr. Brent A. Blue; Dr. Jacques Roux; Sharon Breitweiser; Rebecca L. Archer; Lori Bowdler; and Rev. Warren Murphy, Appellants (Plaintiffs),
v.
Kathy KARPAN, Secretary of State, State of Wyoming; Unseen Hands Prayer Circle Political Action Committee; Kathy Helling; Richard R. Larson; and Alan C. Stauffer, Appellees (Defendants).
PLANNED PARENTHOOD OF WYOMING; Campbell County Voices for Choice; Carbon County Coalition for Choice; Converse County Coalition for Choice; Fremont County Pro-Choice Network; Teton County Coalition for Choice; and Cindy Chace, Appellants (Plaintiffs),
v.
Kathy KARPAN, Secretary of State, State of Wyoming, Appellee (Defendant).
Nos. 94-8, 94-9.
Supreme Court of Wyoming.
September 7, 1994.
*283 Kate M. Fox of Burgess, Davis & Cannon, Cheyenne, Kathryn Kolbert and Simon Heller, the Center for Reproductive Law & Policy, New York City, for appellant Wyoming Nat. Abortion Rights Action League.
Robert M. Shively of Murane & Bostwick, Casper, Roger Evans and Carole Chervin, Planned Parenthood Federation of America, New York City, for appellant Planned Parenthood of Wyoming.
Joseph B. Meyer, Atty. Gen., Michael L. Hubbard, and Rowena L. Heckert, Senior Asst. Attys. Gen., for appellee Kathy Karpan, Secretary of State, State of Wyo.
Richard H. Honaker of Honaker, Hampton & Newman, Rock Springs, for appellee Unseen Hands Prayer Circle Political Action Committee, Richard R. Larson, and Alan C. Stauffer.
Richard L. Williams and Barry G. Williams of Williams, Porter, Day & Neville, Casper, for appellee Kathy Helling.
Before GOLDEN, C.J., THOMAS, MACY,[*] and TAYLOR, JJ., and CARDINE,[**] J. (Retired).
THOMAS, Justice.
The major concern in these consolidated cases is whether this court should order that an initiative measure not be placed on the general election ballot because of its potential unconstitutionality, if enacted. Embraced within this question are issues relating to the existence of a justiciable controversy; the unconstitutionality vel non of the proposed initiative measure; the constitutional invalidity of the measure because the title and summary do not clearly express its subject, and the body of the initiative contains more than a single subject; and whether the correct election year was selected for the purpose of tabulating the required number of signatures. Recognizing a split of authority with respect to the existence of a justiciable controversy, we hold that, if enacted, the measure *284 would not be unconstitutional in its entirety under current federal standards. It follows that it should be included in the general election ballot unless one or more of the alternative grounds urged by the appellants is valid. We further hold that the title of the measure is sufficient; it does not contain more than one subject; and the correct general election year was applied to tabulate the required number of signatures. We affirm the decision of the district court in denying relief by its Order of Dismissal.
The appellants in these consolidated cases essentially represent the pro-choice stance with respect to abortion. They state that the issues are:
A. Does a pre-enactment challenge to a ballot initiative present a justiciable controversy under the Wyoming Constitution?
B. Do the ballot initiative's title and summary fail to clearly express the bill's subject as required by Wyo. Const. art. III § 24?
C. Does the challenged ballot initiative violate the single subject rule expressed in Wyo. Const. art. III § 24 and Wyo.Stat. § 22-24-105?
D. Was the Secretary of State's use of the number of voters in the 1990 election rather than the 1992 election a violation of the requirement at Wyo. Const. art. III § 52(c) that signatures be obtained from 15% "of those who voted in the preceding general election?"
The appellees, other than the Secretary of State, represent the pro-life stance. The pro-life faction sets forth the issues in this way:
1. Is a pre-enactment challenge to the substantive constitutionality of legislation proposed by a ballot initiative justiciable where the proposed legislation could have been enacted by the legislature itself?
2. If such a pre-enactment challenge is justiciable, can Appellants, under the facial challenge rule, show that the legislation proposed by this initiative, in its entirety, is unconstitutional in every conceivable application?
3. Does the legislation proposed by the challenged ballot initiative violate the single subject rule of Art. 3, § 24 of the Wyoming Constitution?
4. Are Appellants' contentions relating to the title and summary of the proposed bill, including their single subject rule contention, barred by the applicable statute of limitations?
5. Does Art. 3, § 52(c) of the Wyoming Constitution require the petition filed with the Secretary of State to have been signed by qualified voters equal in number to 15 percent of those persons who voted in the 1992 general election or 15 percent of those persons who voted in the 1990 general election, where, prior to the 1992 general election, the petition had been signed by qualified voters equal in number to 15 percent of those who voted in the 1990 general election?
A separate brief was filed by Kathy Helling, in which the issues are articulated in this way:
1. Should a court in Wyoming intervene in the political process of initiative law-making to impose constitutional orthodoxy upon an as-yet-unenacted measure?
2. Does the record support Appellants' claim that the challenged ballot initiative was deceptive to the signatories and would deceive voters in the general election?
3. Does the record support Appellants' challenge to the number of signatures required in order to place the initiative on the 1994 ballot?
The Secretary of State adopts the same issues as those set forth by the pro-choice faction.
The issues in this case are substantially pure issues of law. The essential fact is the text of the proposed initiative measure, and it is attached as Appendix A. To the extent that other facts are significant, we will incorporate them in our discussions of the several issues.
A conclusion that no justiciable controversy is present would resolve this case and demand its dismissal. We articulated the necessary elements for a justiciable controversy under our Uniform Declaratory Judgments Act, WYO.STAT. §§ 1-37-101 to 115 (1988) in Brimmer v. Thomson, 521 P.2d 574, *285 578 (Wyo.1974) (quoting from Sorenson v. City of Bellingham, 80 Wash.2d 547, 496 P.2d 512, 517 (1972)):
"First, a justiciable controversy requires parties having existing and genuine, as distinguished from theoretical, rights or interests. Second, the controversy must be one upon which the judgment of the court may effectively operate, as distinguished from a debate or argument evoking a purely political, administrative, philosophical or academic conclusion. Third, it must be a controversy the judicial determination of which will have the force and effect of a final judgment in law or decree in equity upon the rights, status or other legal relationships of one or more of the real parties in interest, or, wanting these qualities be of such great and overriding public moment as to constitute the legal equivalent of all of them. Finally, the proceedings must be genuinely adversary in character and not a mere disputation, but advanced with sufficient militancy to engender a thorough research and analysis of the major issues." (Emphasis supplied [by Brimmer court].)
Application of these elements leads us to conclude that the first is met because both the pro-life parties and the pro-choice parties have current, concrete rights or interests relating to this controversy. Our judgment, either allowing the initiative to be included on the ballot, or precluding its inclusion, would effectively operate upon the factual dispute between these parties. Thus, the second element is satisfied. As to the third element, our determination will have the force and effect of a final judgment upon the rights, status, or other legal relationships of the real parties in interest. See Rocky Mountain Oil & Gas Ass'n v. State, 645 P.2d 1163 (Wyo.1982) (holding that if a declaratory judgment will not end the controversy, it is not proper). We also perceive this matter as one involving great and overriding public moment. See Washakie County Sch. Dist. No. 1 v. Herschler, 606 P.2d 310 (Wyo.1980), cert. denied, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28. There can be little question here that these proceedings are sufficiently "genuinely adversary in character" as to satisfy the fourth element of the Brimmer test. The parties quite vigorously support their own position and oppose the contrary stance with equal vigor. Indeed, we can judicially notice that this is an issue of deep, bitter, and sometimes violent debate throughout this country.
We hold there is nothing in our law relating to justiciability that would inhibit the consideration of this case. See Reiman Corp. v. City of Cheyenne, 838 P.2d 1182 (Wyo.1992). This conclusion is compatible with the policy proclamation found in WYO. STAT. § 1-37-107, which states that specific enumerations do not limit or restrict the exercise of the general powers conferred under the act.
We acknowledge that the power of the electorate to enact laws through the initiative process is of "equal dignity" to the power of the legislature to adopt statutes. An apt statement of this concept is found in 82 C.J.S. Statutes § 118 (1953):
Through the initiative the people are a coordinate legislative body with co-extensive legislative power, exercising the same power of sovereignty in passing on measures as that exercised by the legislature in passing laws. Statutes enacted by the people directly under the initiative are of equal dignity with those passed by the legislature, for the result is the same in either case.
See also Queen Creek Land & Cattle Corp. v. Yavapai County Bd. of Supervisors, 108 Ariz. 449, 501 P.2d 391 (1972); Iman v. Bolin, 98 Ariz. 358, 404 P.2d 705 (1965). In Wyoming, a measure adopted through the initiative process enjoys a superior status because it is not subject to veto and, while it may be amended at any time, it cannot be repealed by the legislature within two years of its effective date. WYO. CONST. art. 3, § 52(f). The only proscriptions with respect to the adoption of measures by initiative and referendum are found in Article 3, Section 52(g) of the Constitution of the State of Wyoming, which states:
The initiative shall not be used to dedicate revenues, make or repeal appropriations, create courts, define the jurisdiction *286 of courts or prescribe their rules, enact local or special legislation, or enact that prohibited by the constitution for enactment by the legislature.
In our sister jurisdictions that have constitutional provisions for the initiative process, the majority of courts have ruled that a controversy over the constitutionality of an initiative is justiciable only after it has been enacted. These courts clearly have held that any pre-election challenge to the constitutionality of an initiative does not present a justiciable controversy under any circumstances. Tilson v. Mofford, 153 Ariz. 468, 737 P.2d 1367 (1987); Iman, 98 Ariz. 358, 404 P.2d 705; McKee v. City of Louisville, 200 Colo. 525, 616 P.2d 969 (1980); Associated Taxpayers of Idaho, Inc. v. Cenarrusa, 111 Idaho 502, 725 P.2d 526 (1986); Bowe v. Secretary of the Commonwealth, 320 Mass. 230, 69 N.E.2d 115 (1946); Anderson v. Byrne, 62 N.D. 218, 242 N.W. 687 (1932); Barnes v. Paulus, 36 Or.App. 327, 588 P.2d 1120 (1978); State ex rel. Althouse v. City of Madison, 79 Wis.2d 97, 255 N.W.2d 449 (1977). The majority rule usually is explained by the prohibition against "advisory opinions."
In some of those jurisdictions, pre-enactment challenges are justiciable and can be the subject of judicial review if the initiative addresses subject matter that is excluded from or proscribed by the initiative process as delineated in the constitutional measure. See, e.g., Whitson v. Anchorage, 608 P.2d 759 (Alaska 1980) (where municipal charter amendment in initiative was in conflict with state statute); Boucher v. Engstrom, 528 P.2d 456 (Alaska 1974) (where initiative would have permitted the passage of a local or special law); Convention Center Referendum Committee v. Dist. of Columbia Bd. of Elections and Ethics, 441 A.2d 889 (App.D.C. 1981) (where initiative would have permitted the appropriation of funds); Bowe, 69 N.E.2d 115 (where court held it had the authority to enforce the constitutional exclusions to the initiative process).
The Supreme Court of Arizona stated its rationale in this way:
Just as under the separation of powers doctrine the courts are powerless to predetermine the constitutionality of the substance of legislation, so also they are powerless to predetermine the validity of the substance of an initiated measure.
* * * * * *
In the absence of any constitutional or statutory directive to the contrary, the proper place to argue about the potential impact of an initiative is in the political arena, in speeches, newspaper articles, advertisements and other forums. The constitutionality of the interpretation or application of the proposed amendment will be considered by this court only after the amendment is adopted and the issue is presented by litigants whose rights are affected.
Tilson, 153 Ariz. at 470, 473, 737 P.2d at 1369, 1372 (citations omitted, emphasis added). This emphasized language suggests that Arizona might make room for a pre-enactment adjudication of the constitutionality of an initiative, but only if judicial action was directed by state constitutional or statutory law. Whitson, 608 P.2d 759; Boucher, 528 P.2d 456; Bowe, 69 N.E.2d 115.
In some jurisdictions, the constitutionality vel non of a proposed initiative measure is perceived as justiciable on the premise that the electorate has no right to enact an unconstitutional law. In State ex rel. Harper v. Waltermire, 213 Mont. 425, 691 P.2d 826, 828-29 (1984), the Supreme Court of Montana, while recognizing that "the initiative power should be broadly construed to maintain the maximum power in the people," invalidated the measure before it as an attempt by the electorate to "circumvent their Constitution by indirectly doing that which cannot be done directly." The Supreme Court of California, declaring improper a proposed initiative that would have allowed redistricting more than once during the ten-year period following the federal census, stated the proposition in this way:
A statutory initiative is subject to the same state and federal constitutional limitations as are the Legislature and the statutes which it enacts.
Legislature of State of Cal. v. Deukmejian, 34 Cal.3d 658, 194 Cal.Rptr. 781, 669 P.2d 17, 26-27 (1983). To the same effect are Hessey *287 v. Burden, 615 A.2d 562 (D.C.App.1992); Stumpf v. Lau, 108 Nev. 826, 839 P.2d 120 (1992) (where initiative placing term limits on United States Congressman or Senator from Nevada was held violative of the federal constitution); In Re Petition No. 349, 838 P.2d 1 (Okla.1992) (where a similar petition to initiative at issue in this case was kept off the ballot because it violated the federal constitution); City of Newark v. Benjamin, 144 N.J.Super. 58, 364 A.2d 563 (1976) (where general rule against pre-election review is abrogated if initiative is facially invalid or initiative fails to meet statutory requirements). As early as 1934, the Supreme Court of Florida, addressing a constitutional amendment, succinctly articulated this rationale:
If a proposed amendment to the state Constitution by its terms specifically and necessarily violates a command or limitation of the Federal Constitution, * * * the prescribed legal procedure for submitting such a proposed amendment to the electorate * * * may be enjoined at the suit of proper parties in order to avoid the expense of submission, when the amendment, if adopted, would palpably violate the paramount law and would inevitably be futile and nugatory and incapable of being made operative under any conditions or circumstances.
Gray v. Winthrop, 115 Fla. 721, 156 So. 270, 272 (1934).
We acknowledge the political pragmatism of the majority view. In part, that hinges upon a recognition that the issue may be mooted by the failure to adopt the proposed initiative. Still, we perceive no difference between the situation in which an initiative may violate a command or limitation of the state or federal constitution and one in which the constitutional provision, as interpreted and applied, is violated.
It is clear, and the pro-life faction does not substantially disagree, that the proposed initiative entitled "Wyoming Human Life Protection Act" is partially unconstitutional under federal standards. In Section 35-6-102 of the proposed initiative, abortion is prohibited and, in conjunction with provisions of existing law, it would be criminalized. This without regard to the doctrine of Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. ___, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). The provisions directly contravene the rule of those cases.
In Roe, the Supreme Court of the United States ruled that state criminal statutes prohibiting abortions at any stage of pregnancy except to save the mother's life are unconstitutional under the federal constitution. The fundamental right of privacy was declared to be implicit in the concept of ordered liberty. The mother's right to privacy, including abortion, and the interest of the state in safeguarding health, maintaining medical standards, and protecting potential lives were balanced in a framework of trimesters. Roe represents the legal status quo with respect to federal constitutionality, and we cannot predict any change in that rule based upon the history to this time.
There was substantial speculation about the possibility of a new case overruling or undercutting the principles articulated in Roe. Casey ended this speculation and upheld the rule of Roe to the effect that a state may not prohibit a woman from making the ultimate decision to terminate her pregnancy prior to viability of the fetus. The trimester framework was replaced by an undue burden test for the purpose of evaluating abortion restrictions prior to viability. Viability was defined as the earliest point at which the state's interest is constitutionally adequate to justify a legislative ban on non-therapeutic abortions. Under federal law, it is the point in time at which the realistic possibility exists of maintaining and nourishing life outside the womb.
Because the initiative at issue is contrary to the ruling of the Supreme Court of the United States in Roe, recently reaffirmed in Casey, logic dictates that a justiciable controversy is present in the same way that one would be present if the language of the constitution were challenged directly. A ruling by this court on such a constitutional issue should not be perceived as simply an advisory opinion. The dynamics of the situation are different from that in which the constitutionality *288 of an initiative proposition has not been previously adjudicated.
We hold that an initiative measure that contravenes direct constitutional language, or constitutional language as previously interpreted by the highest court of a state or of the United States, is subject to review under the declaratory judgment statutes. That scenario satisfies the elements articulated in Brimmer and, if such a measure were clearly unconstitutional, there would be no purpose in submitting it to the electorate under the initiative process. The initiative process was designed and intended for a different purpose than simply providing a formal straw vote.
It is this proposition that the pro-choice faction relies upon in seeking to inhibit the initiative from the general election ballot. Their argument encompasses the claim that there is a burden on the electoral process if voters address time, thought, and deliberation to legislation, the adoption of which is a hollow act. They also argue that the effort is a waste of state time and money in preparing the ballot and submitting it to the electorate.
Both the federal and the state constitutions require our compliance with federal constitutional law on issues preserved within the federal domain.[1] This concept, we hold, brings the issue within the language of Article 3, Section 52(g) of the Constitution of the State of Wyoming providing that:
The initiative shall not be used to * * * enact that prohibited by the constitution for enactment by the legislature.
The proposed initiative makes no allowance for a woman's pre-viability decision with respect to a non-therapeutic abortion. If it were adopted, it could not withstand challenges under the rule of Roe and Casey, and it clearly would be unconstitutional under those standards. This does not end the case, however.
State funding of abortions specifically was addressed in Maher v. Roe, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977). The Supreme Court of the United States held that the equal protection clause of the Fourteenth Amendment did not demand that a state participating in the medicaid program pay expenses incident to non-therapeutic abortions for indigent women. Other provisions exist in the proposed initiative, particularly Section 35-6-117, that prohibit the appropriation of state funds for abortions except for cases of sexual assault, incest, and pregnancies detrimental to the health of the mother. This proposed section in the initiative is the same in substance as the current section and would be constitutional within the parameters of Maher. In addition, other provisions exist addressing a prohibition of civil liability for refusal to perform abortion and the necessity for reporting abortion.
The Supreme Court of Florida has held that it is necessary to find a measure unconstitutional in its entirety in order to proscribe its submission to the electorate, saying
when a proposal of the nature here involved is assaulted on the ground that it violates the Constitution, the courts will not interfere if upon ultimate approval by the electorate such proposal can have a valid field of operation even though segments of the proposal or its subsequent applicability to particular situations might result in contravening the organic law. In other words, if an examination of the proposed amendment reveals that if adopted it would be legally operative in part, even though it might ultimately become necessary to determine that particular aspects violate the Constitution, then the submission of such a proposal to the electorate for approval or disapproval will not be restrained.
Dade County v. Dade County League of Municipalities, 104 So.2d 512, 515 (Fla.1958) (citations omitted).
In South Carolina, a proposed municipal ordinance was attacked on the grounds it was *289 facially defective, rather than on constitutional grounds. The Supreme Court affirmed a decision of the circuit court holding that it was facially defective and the town could not be required to submit it to the voters. With respect to the concept of facial unconstitutionality, the Court said:
Courts recognizing the propriety of pre-election review will not interfere with the submission of an initiated ordinance to the electorate if the initiated ordinance can be construed to be legally operative in part, even though ultimately a court might need to determine which aspects of the initiated ordinance are invalid. Dade County, 104 So.2d at 515.
Hilton Head Island v. Expressway Opponents, 307 S.C. 449, 415 S.E.2d 801, 805 (1992).
The logic and rationale from the Supreme Court of Florida and the Supreme Court of South Carolina are pertinent and compelling. We hold that an initiative, attacked as facially unconstitutional, must be unconstitutional in toto before we could foreclose its inclusion in the ballot for a vote of the people.
Under our constitution, and the federal constitution as interpreted, there are aspects of the Wyoming Human Life Protection Act that are constitutional. Given that fact, and the prospect of severability, this court cannot, by a pre-enactment ruling, declare the proposed bill unconstitutional. It follows that it should be included on the 1994 general election ballot and voted upon by the people. A legislative measure adopted either by the legislature or by the people through the initiative process carries with it a presumption of constitutionality under our law. Consequently, in the absence of any prior adjudication with respect to the other provisions of the initiative, we do not perceive our authority under the Uniform Declaratory Judgments Act to reach those issues.
We are not persuaded by the pro-life argument that, like a legislative bill, an initiative cannot be reviewed until it is enacted. Justice Oliver Wendell Holmes stated for the Supreme Court of the United States, "litigation cannot arise until the moment of legislation is passed." Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 228, 29 S.Ct. 67, 70, 53 L.Ed. 150, 159 (1908). There is a difference, however, between the initiative process and the normal legislative process. Once the initiative has been submitted to the voters in the petition drive, its language cannot be changed. For the purpose of knowing what the final form of the measure will be, the proposed initiative settles that question. Consequently, ripeness of the initiative issue is not the same problem for purposes of judicial review as ripeness of a legislative measure might be. The latter can be amended at any point in the legislative process up until its final enactment. This is not true regarding an initiative.
Since we hold that a justiciable controversy exists and the initiative is not foreclosed from the ballot because it is not totally unconstitutional, we turn to the claims of the pro-choice faction that the initiative is defective in terms of its title and the inclusion of more than one subject in the body of the initiative. The pro-choice faction contends that, in both respects, the initiative violates the provisions of Article 3, Section 24 of the Wyoming Constitution which reads:
Bill to contain only one subject, which shall be expressed in title.No bill, except general appropriation bills and bills for the codification and general revision of the laws, shall be passed containing more than one subject, which shall be clearly expressed in its title; but if any subject is embraced in any act which is not expressed in the title, such act shall be void only as to so much thereof as shall not be so expressed.
The assumption of this argument is that the language of Article 3, Section 52(g) which forecloses the use of the initiative to "enact that prohibited by the constitution for enactment by the legislature" invokes the provisions of Article 3, Section 24 of the constitution. Logic supports that position and, for purposes of resolving this case, we assume that the initiative must comply with the requirements for a valid legislative bill.
The pro-life faction argues that the issues relating to the single-subject rule and whether the title clearly expresses the substantive *290 contents of the initiative are not before us. They rely on WYO.STAT. § 22-24-122 (1992), which provides:
Any person aggrieved by any determination made by the secretary of state or by the attorney general may bring an action in the district court of Laramie county to have the determination reviewed by filing application within thirty (30) days of the date on which notice of the determination was given.
The pro-life faction concedes that the pro-choice faction brought this action for declaratory injunctive relief within thirty days of the determination by the Secretary of State of the numerical sufficiency of the signatures. The pro-life faction contends, however, that thirty-day period began to run when the title, summary, and text of the proposed initiative had been "approved, printed, and circulated," which occurred in August of 1991. We do not accept this reading of the statute. A rule that the thirty-day period of limitations begins to run with respect to each of the preliminary matters, when it is completed, would result in "piecemeal" litigation. This court does not condone that approach. See Matter of Paternity of JRW, 814 P.2d 1256 (Wyo. 1991); CLS v. CLJ, 693 P.2d 774 (Wyo.1985); Manners v. Manners, 706 P.2d 671 (Wyo. 1985). We hold that the pro-choice advocates brought their action for declaratory and injunctive relief as to all issues within the thirty-day period following the determination by the Secretary of State that the initiative qualified for the ballot. That is a timely action under the statute.
We have defined two purposes for the provisions found in Article 3, Section 24 of our constitution. The first is to prevent the fraud or surprise that could result if provisions contained in the body of a bill were not reflected in a general way in the title itself. The constitution demands that the title give a reader general information about the contents and provisions which will be found in the bill if the reader continues with the entire text. We have tempered this requirement, in the legislative context, by concluding that the title need not outline specifically every single textual provision or specific aspect of the bill but, instead, only "reasonable adherence" is required. Brinegar v. Clark, 371 P.2d 62, 66 (Wyo.1962). See also Morrow v. Diefenderfer, 384 P.2d 601 (Wyo.1963); State ex rel. Fire Fighters Local No. 946 v. City of Laramie, 437 P.2d 295 (Wyo.1968). The reader must be given, by the title, general notice of what the bill regulates or proscribes. See Smith v. Hansen, 386 P.2d 98, 99-100 (Wyo.1963).
The second purpose of Article 3, Section 24 of the Constitution is to prevent what we have described as "logrolling" or "piggybacking." These terms allude to the combination in the same bill or initiative of unrelated and separate subjects that have nothing to do with the subject of the original legislation. That policy was articulated in 1893 in this language of our court:
[I]t was designed to prevent incongruous and diverse legislation in one bill, to make fruitless the practice known as "log rolling," and to banish hodge-podge legislation from the statute books; to render futile the grouping together in an omnibus bill a number of distinct legislative measures, each of which could not pass on its own merits, but which, with the aid of its own adherents, and those advocating the other measures, would become a law.
In re Fourth Judicial District, 4 Wyo. 133, 144, 32 P. 850, 852 (Wyo.1893).
In applying this constitutional standard to the initiative before us, we conclude that every provision in the initiative is germane to the subjects expressed in the title. See In re Fourth Judicial District. The initiative creates a new paragraph (7) providing a definition for "unborn child"; it amends the definitions of "abortion," "conception," and "pregnancy," found in the current statute; it strikes current language to the effect that an abortion cannot be performed after viability and replaces that language with language providing, after conception, an abortion may be performed only if the mother's life is in danger; it provides affirmative defenses to the charge of abortion if the pregnancy is the result of sexual assault or incest and has been reported to law enforcement personnel; it provides procedures for the pregnant woman and the physician to follow; it specifies abortion will not be funded by the *291 state; and it provides for an effective date of February 9, 1993. We hold that the title of the initiative adequately expresses the substantive provisions included within the body of the initiative.
With respect to the contention that the initiative violates the single subject rule, our reading of the initiative does not lead to that conclusion. It is correct that an initiative must not contain separate and distinct subjects in the same bill. See In re Fourth Judicial District. The district court concluded that the purpose of the initiative is to discourage abortions, which is reflected in the short title of the bill, the "Wyoming Human Life Protection Act." We agree with the district court because we read the language of the initiative, criminalizing abortion in most instances and withholding state funding for abortions under certain circumstances, to fit within the single-subject rule. Those features are two methods by which the drafters of the initiative intended to achieve their goal of "protecting human life." In its decision letter, the district court stated, "the initiative does not `embrace two or more dissimilar and discordant subjects,' but presents a means to achieving a desired end." See Fire Fighters Local No. 946, 437 P.2d at 303. We adopt this ruling.
There is left for resolution only the issue posed by the pro-choice parties that the Secretary of State improperly invoked the 1990 election as the "preceding general election" to establish the number of "qualified registered voters" so that 24,646 signatures were required to qualify the initiative for the ballot. The Secretary of State had determined that the petition complied with the constitutional and statutory provisions, and the initiative petition was approved on December 4, 1992, pursuant to a letter dated December 8, 1992. That determination led to the filing of this action on December 28, 1992 by the pro-choice parties pursuant to WYO.STAT. § 22-24-122.
In challenging the determination by the Secretary of State, the pro-choice parties contended they were aggrieved because, among other reasons, the petition did not contain the required number of appropriate signatures. They point to the record which demonstrates signatures submitted after November 3, 1992, the date of the general election in that year, were counted by the Secretary of State. Their contention is that the inclusion of such signatures made the 1992 general election the "preceding general election" and that, in view of the number of votes cast in 1992, 30,540 signatures were required for these petitions.
The pro-life parties insist that 1990 is the correct general election, arguing that all but three of the 36,362 signatures submitted were obtained prior to the date of the 1992 election and, thus, the votes cast in the 1990 general election furnish the proper base for applying the constitutional formula. The district court agreed with this position, stating in its opinion letter, "the Secretary of State reasonably used 15% of the qualified voters in the 1990 General Electionat the time the voters signed these petitions, 1990 was the `preceding general election' for all but a de minimis number of votes." We justify the decision, but on a different premise from that used by the Secretary of State or the district court.
The statutes adopted to implement the initiative process set forth in Article 3, Section 52 of the Constitution provide, in pertinent part, as follows:
(a) Petitions may be filed with the secretary of state if signed by a sufficient number of qualified registered voters as required by the Wyoming constitution.
(b) Petitions for an initiative shall be submitted to the secretary of state for verification within the eighteen (18) month period following the date the first set of petition forms are provided to the sponsors. Any petition not submitted within the eighteen (18) month period is void for all purposes.
WYO.STAT. § 22-24-115 (1992).
(a) Within not more than sixty (60) days of the date the petition is filed, the secretary of state shall review it and shall notify the committee whether the petition was properly or improperly filed. The petition shall be determined to be improperly filed if:

*292 (i) There is an insufficient number of signatures of qualified registered voters;
(ii) The subscribers were not resident in at least two-thirds of the counties of the state.
WYO.STAT. § 22-24-116 (1992).
The petition and its filing have been defined by this court as follows:
While the constitution provides it shall not be filed unless it has the requisite signatures, we construe the legislative version to mean that the petition is initially deposited with the Secretary in order that it may be reviewed for adequacy to determine whether there are the required number of signatures from two-thirds of the state's counties and the subscribers are qualified registered voters.
Thomson v. Wyoming In-Stream Flow Committee, 651 P.2d 778, 782 (Wyo.1982).
The record establishes that on February 18, 1992, 28,436 signatures were filed with the Secretary of State. This number exceeded the required number by 3,790. The Secretary of State then determined that the initiative would not be on the November, 1992 ballot because 3,818 signatures were rejected, thus, making it "impossible for the petition drive to obtain the required 24,646 signatures, even if the rest of the petitions were verified at 100%. The pro-life parties then proceeded to obtain additional signatures and to achieve certification.
On June 15, 1993, the Secretary of State issued a certification with respect to the signature submissions. That certificate demonstrates that 36,359 people signed the petition prior to the general election on November 3, 1992, and only three people signed it subsequent to that date. The certification also establishes that 35,744 signatures were submitted prior to November 3, 1992, and only 618 were submitted after that date. In addition, it demonstrates that 391 signatures, which were submitted after November 3, 1992, were included in the count to reach the required total of 24,646. It is also clear that 2,571 signatures were submitted before November 3, 1992, but were never counted by the Secretary of State.
The certification is explained by the affidavit of the Secretary of State dated August 9, 1993. The Secretary of State advised that she had participated in the definition of "preceding general election" in August of 1990 at the request of sponsors of the Triple Trailers Initiative. The question presented in this latter initiative was whether the target number of signatures should be adjusted after the 1990 election. In the affidavit, the Secretary of State says:
We interpreted this clause as referring to the election preceding the beginning of the petition drive. Thus, we decided the signature target would be based on the 1988 general election and would not be adjusted even though the initiative drive extended beyond the 1990 general election.
The Secretary of State's interpretation does not fit the language this court used in addressing the initiative process. We said:
The application * * * [was] approved October 20, 1980. At that time, on the basis of the 1978 general election, the number of signatures required would have been 21,345. However, by the time the sponsors made their final submission of the accumulated petitions on December 11, 1981 (some had been delivered in earlier months), the last general election had been held in November 1980, so the number of qualified voter signatures required had increased to 27,154.
Wyoming In-Stream Flow, 651 P.2d at 783 (emphasis added).
We are satisfied that Wyoming In-Stream Flow correctly identified the appropriate general election as the one preceding the time the accumulated petitions are submitted to the Secretary of State.
It is clear that signatures were submitted both before and after the 1992 general election and some submitted after that election were used to arrive at the 24,646 required number. If we were to accept the definition by the Secretary of State as to the point in time for establishing the pertinent election, we would not honor what this court said in Wyoming In-Stream Flow. Instead, we hold the date of the final submission of the petition is the date that controls the *293 determination of which prior general election will be used to calculate the 15 percent signature requirement for the petition.
In this particular instance, the petition included 2,571 signatures submitted prior to the 1992 election, but not counted in arriving at the 24,646 signatures. If the counting process were continued appropriately, the Secretary of State would exclude from the count the 391 signatures that were submitted after the 1992 general election, but would determine if at least 391 signatures from the 2,571 that were not counted were valid. The number of valid signatures submitted to the Secretary of State before the 1992 election would justify the declaration that the petition was properly filed in accordance with WYO. STAT. § 22-24-116 (1992), if that total achieved 24,646. If that total were not reached, the Secretary of State would declare the initiative improperly filed because it would be impossible for the number to achieve the 30,540 that would be required based upon the votes cast in the 1992 general election.
The trial judge was satisfied that the requisite signatures to meet the 1990 general election requirement were available. Since the review process in the office of the Secretary of State evidenced a validity of signatures at a 75.3 percent rate, statistically, 1,937 of the 2,571 uncounted signatures would be valid. That number substantially exceeds the required number of 391 for purposes of the validity of this initiative. Therefore, we assume that the petitions the pro-life parties presented achieve the required 24,646 signatures, and those signatures were presented to the office of the Secretary of State prior to the 1992 general election. This leads to a conclusion that the petition is properly filed allowing it to be presented on the 1994 general election ballot.
We leave open the possibility that the pro-choice parties can demonstrate the invalidity of this presumption by showing that, in fact, the petitions filed prior to the general election of 1992 did not encompass the required number of signatures. Obviously, that effort must be undertaken promptly because, if it is not, the petition will be on the 1994 general election ballot.
In this instance, we hold that the certification properly could be made relying upon the general election of 1990, but limited to only those signatures submitted prior to November 3, 1992. On that premise, the 391 signatures submitted after November 3, 1992 should not be included to reach the required total of 24,646, but the 2,571 submitted before November 3, 1992, which never were counted by the Secretary of State, should be included. As we have noted previously, the count may be subject to challenge, but that must be done promptly.
To summarize, we hold that a justiciable controversy is presented to the court and, since the initiative proposed would not be totally unconstitutional under current law, it should be on the general election ballot. We find no merit in the contentions of the pro-choice parties regarding the title of the initiative, the incorporation of more than one subject in the language of the initiative, nor in the failure to achieve the required number of signatures according to the constitutional formula. With respect to the time for identifying the required number of signatures, we hold that the time is established by the date on which the petitions are initially deposited with the Secretary of State in order to make a determination as to the validity of the signatures and representation from two-thirds of the state's counties. In this instance, that preceded the 1992 general election, and the required number of signatures will be determined by the 1990 general election.
The judgment of the district court is affirmed.
TAYLOR, J., files a concurring opinion.
MACY, J., and CARDINE, J. (Retired), will dissent; dissenting opinions to be filed at a later date.

APPENDIX A

A BILL

FOR
AN ACT to amend W.S. 35-6-101, 35-6-102, 35-6-106, 35-6-107(a)(v) and by creating a *294 new paragraph (vii), and 35-6-117 relating to abortions; specifying when abortions may be performed and providing for affirmative defenses; providing definitions; providing procedures; specifying when appropriated funds may be used for abortions; and providing for an effective date.
Be It Enacted by the People of the State of Wyoming:
Section 1. W.S. 35-6-101, 35-6-102, 35-6-106, 35-6-107(a)(v) and by creating a new paragraph (vii), and 35-6-117 are amended to read:
35-6-101. Short title; definitions.
(a) THIS ACT SHALL BE KNOWN AND MAY BE CITED AS THE "WYOMING HUMAN LIFE PROTECTION ACT."
(b) As used in the act, unless the context otherwise requires:
(i) "Abortion" means an act, procedure, device or prescription administered to or prescribed for a pregnant woman by any person with knowledge of the pregnancy, including the pregnant woman herself, with the intent of producing the premature expulsion, removal or termination of a human embryo or fetus, except that in cases in which the viability of the embryo or fetus is threatened by continuation of the pregnancy, early delivery after viability by commonly accepted obstetrical practices shall not be construed as an abortion THE USE OR PRESCRIPTION OF ANY INSTRUMENT, MEDICINE, DRUG OR ANY OTHER SUBSTANCE OR DEVICE WITH THE INTENT TO TERMINATE THE PREGNANCY OF A WOMAN KNOWN TO BE PREGNANT, EXCEPT TO SAVE THE LIFE OR PRESERVE THE HEALTH OF AN UNBORN CHILD, TO REMOVE A DEAD UNBORN CHILD, OR TO DELIVER AN UNBORN CHILD PREMATURELY BY ACCEPTED MEDICAL PROCEDURES IN ORDER TO PRESERVE THE HEALTH OF BOTH THE MOTHER AND THE UNBORN CHILD;
(ii) "Accepted medical procedures" means procedures of the type and performed in a manner and in a facility which is equipped with surgical, anaesthetic, resuscitation and laboratory equipment sufficient to meet the standards of medical care which physicians engaged in the same or similar lines of work in the community would ordinarily exercise and devote to the benefit of their patients;
(iii) "Conception" means the foundation FUSION of the ovum by the spermatozoa A HUMAN SPERMATOZOAN WITH A HUMAN OVUM;
(iv) "Hospital" means those institutions licensed by the state department of health and social services as hospitals;
(v) "Physician" means any person licensed to practice medicine in this state;
(vi) "Pregnant" or "PREGNANCY" means that FEMALE REPRODUCTIVE condition of a woman who has a human embryo or fetus within her as the result of HAVING AN UNBORN CHILD IN THE MOTHER'S BODY, BEGINNING WITH conception;
(vii) "UNBORN CHILD" MEANS AN INDIVIDUAL ORGANISM OF THE SPECIES HOMO SAPIENS FROM CONCEPTION UNTIL BIRTH;
(vii) (viii) "Viability" means that stage of human development when the embryo or fetus UNBORN CHILD is able to live by natural or life-supportive systems outside the womb of the mother according to appropriate medical judgment;
(viii) (ix) "Woman" means any female person;
(ix) The singular where used herein includes the plural, the plural includes the singular, and the masculine includes the feminine or neuter, when consistent with the intent of this act and when necessary to effect its purpose;
(x) "Minor" means a pregnant woman under the age of eighteen (18), but does not include any woman who:
(A) Is legally married;
(B) Is in active military service; or
*295 (C) Has lived apart from her parents or guardian, has been financially independent and has managed her own affairs for at least six (6) months prior to a proposed abortion;
(xi) "Parents" means both parents of a minor if they are both living, or one (1) parent of the minor if only one (1) is living or if the second parent cannot be located through a reasonably diligent effort;
(xii) "This act" means W.S. 35-6-101 through 35-6-118.
35-6-102. Life protective measures; affirmative defenses.
(a) An abortion shall not be performed after the embryo or fetus has reached viability except when necessary to preserve the woman from an imminent peril that substantially endangers her life or health, according to appropriate medical judgment. EXCEPT AS PROVIDED IN SUBSECTION (b) OF THIS SECTION, NO PERSON SHALL PERFORM AN ABORTION UPON A PREGNANT WOMAN UNLESS HER ATTENDING PHYSICIAN:
(i) REASONABLY DETERMINES, IN HIS MEDICAL JUDGMENT, THAT HER LIFE WOULD BE ENDANGERED IF THE UNBORN CHILD WERE CARRIED TO FULL TERM; AND
(ii) RECORDS, EITHER BEFORE OR AFTER THE ABORTION, THE BASIS FOR HIS DETERMINATION IN THE WOMAN'S MEDICAL RECORD.
(b) IT IS AN AFFIRMATIVE DEFENSE TO ANY CHARGE UNDER SUBSECTION (a) OF THIS SECTION THAT:
(i) THE PREGNANCY IS THE RESULT OF A SEXUAL ASSAULT, AS DEFINED BY W.S. 6-2-301, WHICH IS REPORTED TO A LAW ENFORCEMENT AGENCY BEFORE THE ABORTION;
(ii) THE PREGNANCY IS THE RESULT OF INCEST, AS DEFINED BY W.S. 6-4-402, AND THE INCIDENT IS REPORTED TO A LAW ENFORCEMENT AGENCY BEFORE THE ABORTION.
(c) THE DEFENDANT'S BURDEN OF PRODUCING EVIDENCE UNDER PARAGRAPHS (b)(i) AND (b)(ii) OF THIS SECTION IS SATISFIED BY EVIDENCE THAT THE SEXUAL ASSAULT OR INCEST WAS REPORTED TO A LAW ENFORCEMENT AGENCY BEFORE THE ABORTION. IF THE DEFENDANT SATISFIES THE BURDEN OF PRODUCING EVIDENCE AS PROVIDED BY THIS SUBSECTION, THE BURDEN IS THEN UPON THE STATE TO DISPROVE THE AFFIRMATIVE DEFENSE BEYOND A REASONABLE DOUBT.
(d) THE PREGNANT WOMAN SHALL NOT BE HELD CRIMINALLY LIABLE UNDER ANY STATUTE FOR PROCURING OR PARTICIPATING IN THE ABORTION OF HER UNBORN CHILD.
35-6-106. Persons not required to perform abortion; no civil liability for refusal; sanctions or discrimination for refusal forbidden. No person shall, in any way, be required to perform or participate in any abortion or in any act or thing which accomplishes or performs or assists in accomplishing or performing a human miscarriage, euthanasia or any other death of a human fetus or human embryo AN UNBORN CHILD. The refusal for any person to do so is not a basis for civil liability to any person. No hospital, governing board or any other person, firm, association or group shall terminate the employment of, alter the position of, prevent or impair the practice or occupation of, or impose any other sanction or otherwise discriminate against, any person who refuses to perform or participate in any abortion or in any act or thing which accomplishes, performs or assists in accomplishing or performing a human miscarriage, euthanasia or any other death of a human fetus or embryo AN UNBORN CHILD.

35-6-107. Forms for reporting abortions.
(a) The state office of vital records services shall establish an abortion reporting form which shall be used after May 27, 1977 for the reporting of every abortion performed or prescribed in this state. The form shall include the following items in addition to such other information as may be necessary to complete the form, but in no case shall information be required that would tend to disclose *296 the identity of any individual participating in an abortion:
(v) the length and weight of the aborted fetus or embryo CHILD, when measurable;
(vii) THE ATTENDING PHYSICIAN'S REASON OR REASONS FOR PERFORMING THE ABORTION, AND, IF RELEVANT, THE BASIS FOR HIS MEDICAL JUDGMENT THAT THE PREGNANT WOMAN'S LIFE WOULD HAVE BEEN ENDANGERED IF THE UNBORN CHILD HAD BEEN CARRIED TO FULL TERM.
35-6-117. Use of appropriated funds for abortion prohibited; exceptions. No funds appropriated by the legislature of the state of Wyoming shall be used to pay for abortions except when the pregnancy is the result of incest as defined by W.S. 6-4-402 or sexual assault as defined by W.S. 6-2-301 if the assault is reported to a law enforcement agency within five (5) days after the assault or within five (5) days after the time the victim is capable of reporting the assault, or when the life of the mother would be endangered if the unborn child was carried to full term AN ABORTION IS PERFORMED PURSUANT TO THE PROVISION W.S. 35-6-102.
Section 2. If any provision, word, phrase, or clause of this Act or its application to any person or circumstance is held invalid, the invalidity does not affect the provisions, words, phrases, clauses or application of this Act which can be given effect without the invalid provision, word, phrase, clause, or application, and to this end the provisions, words, phrases, and clauses of this Act are severable.
Section 3. This Act is effective February 9, 1993.
TAYLOR, Justice, concurring.
I reluctantly concur.
Reluctantly, because portions of the initiative, as written, violate principles of federal constitutional law announced by the Supreme Court of the United States. The sponsors and the opponents of the initiative admit the defects. Therefore, its submission to the electorate of Wyoming will result in little more than a costly and inefficacious sampling of opinion to be followed by further litigation if the initiative is passed.
Furthermore, this court is indulging in a questionable expediency to permit the initiative process to move forward. This court is presuming that a sufficient number of petition signatures exist. Prior to the general election of November 3, 1992, the supporters of the initiative presented the Secretary of State of the State of Wyoming with some petition signatures which were never counted. This court is applying a presumption to hold that a sufficient number of the 2,571 uncounted signatures are valid. The law requires that the Secretary of State make an empirical determination that petitions have been submitted which contain signatures from a sufficient number of "qualified registered voters." Wyo.Stat. § 22-24-116(a)(i) (1992). However, this court is making a theoretical determination that the signatures are valid based upon the statistical percentage of qualified signatures on the previously verified initiative petitions. The majority opinion correctly admits that these signatures are still subject to challenge. Practically, however, the time for such a challenge is limited. Therefore, the presumption this court is applying may only present another issue for further litigation if the initiative is passed.
Despite my concerns about the constitutionality of portions of the initiative, I believe the political debate would have been better served if this court had followed the majority rule and found that no justiciable controversy was present. There is profound wisdom in the separation of powers doctrines. By allowing the legislative process to be completed before judicial review is sought, our federal and state constitutions permit complete deliberation of important issues. I believe the initiative process should also be allowed to proceed without judicial review of substantive challenges to the proposed law.
In a democracy, the political process is fueled by debate. Debate presents the opportunity to obtain information, to offer opinions, *297 and, ultimately, to persuade. Debate can take place in many forums. Our citizens debate in the mass media, in the halls of government, in the auditoriums of local communities, in the neighborhood coffee shops or in the living rooms of homes across the state. Whatever the forum, the goal of debate is to arrive at a reasoned decision. The voters of Wyoming will make a reasoned decision about this initiative. Notwithstanding the outcome, however, there will be unresolved issues because of the language of the initiative and today's decision.
NOTES
[*] Chief Justice at time of oral argument.
[**] Retired July 6, 1994.
[1] U.S. CONST. art. VI, cl. 2 provides:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; * * * shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.
WYO. CONST. art. 1, § 37 provides:
The State of Wyoming is an inseparable part of the federal union, and the constitution of the United States is the supreme law of the land.