CITIZENS FOR A PUBLIC TRAIN TRENCH VOTE, A NEVADA POLITICAL ACTION COMMITTEE; MIKE TRACY, AKA MICHAEL TRACY, AKA JAMES MICHAEL TRACY; MICHAEL ROBINSON; MARTHA GOULD; GEORGE FLINT; AND BERNARD CLARK, APPELLANTS, v. CITY OF RENO, A MUNICIPAL CORPORATION; DANIEL G. BURK, IN HIS CAPACITY AS WASHOE COUNTY REGISTRAR OF VOTERS; CITIZENS FOR PRIVATE ENTERPRISE; RAY HEATING PRODUCTS, INC.; STEVE SCOLARI, AS TRUSTEE OF THE ALVIN E. SCOLARI FAMILY TRUST; RECORD SUPPLY COMPANY; SDA INC.; CARAVAN CAMPER TOPS, INC.; ROSS MANOR LLC; MARTIN IRON WORKS, INC.; AMERICAN READY MIX, INC.; ELDORADO RESORTS, LTD.; HARRAH'S OPERATING COMPANY, INC.; THE CIRCUS AND ELDORADO JOINT VENTURE, A NEVADA GENERAL PARTNERSHIP, DBA SILVER LEGACY; AND GUY B. ZEWADSKI, RESPONDENTS.

No. 39898

September 6, 2002                                      53 P.3d 387

---

[Rehearing denied September 9, 2002]

YOUNG, J., dissented.

*Patricia D. Cafferata,* Reno, for Appellants.

*McDonald Carano Wilson McCune Bergin Frankovich & Hicks LLP* and *Michael A. Pagni,* Reno, for Respondents.

*Patricia A. Lynch,* City Attorney, and *Randall K. Edwards* and *Jonathan D. Shipman,* Deputy City Attorneys, Reno, for Respondent City of Reno.

*Richard A. Gammick,* District Attorney, and *Leslie H. Admirand* and *David L. Watts-Vial,* Deputy District Attorneys, Washoe County, for Respondent Washoe County Registrar of Voters.

*Guy B. Zewadski,* Reno, in Proper Person.

# OPINION

*Per Curiam:*

The Reno City Council, after years of study and with county, state and federal support, decided to lower the railroad tracks through downtown Reno below street level to mitigate the adverse effects of downtown train traffic. Pre-construction steps have been completed, and the City is now ready to begin construction. This grade separation project, officially designated the Reno Transportation Rail Access Corridor (ReTRAC) and sometimes referred to as the Reno Railroad Corridor, is commonly known as the train trench.

Citizens for a Public Train Trench Vote submitted to the Reno City Clerk a municipal initiative petition, which proposed that the following prohibition be enacted: "The City of Reno shall not construct a depressed trainway ("train trench") within the existing railroad right of way through the central portion of the City of Reno." The Reno City Clerk certified the initiative petition, and the Reno City Council forwarded the initiative petition to the Registrar of Voters under NRS 295.215 for placement on the September 3, 2002 primary ballot. The Reno City Attorney, at the City Council's direction, then sought a judicial declaration that the initiative is unconstitutional and an injunction to keep the initiative off the ballot. On June 19, 2002, the day the primary election ballots had to be sent to the printer, the district court entered a written order declaring the initiative unconstitutional—because it dictates an administrative decision and because it impairs contractual obligations—and permanently enjoining the Washoe County Registrar of Voters from placing the initiative on any city ballot.

The initiative's proponents filed this appeal, challenging the district court's injunction and seeking to have the initiative included on the November 5, 2002 general election ballot. We conclude that the initiative concerns an administrative matter, which exceeds the electorate's initiative power, and that the district court properly enjoined its inclusion on the ballot.

## BACKGROUND

The railroad tracks through downtown Reno have long been both boon and bane, and the City has considered various solutions to the problems posed by the tracks' location. In 1936, the United States Bureau of Public Roads, precursor to the Federal Highway Administration (FHWA), proposed elevating the tracks. In response, the City Engineer recommended lowering the tracks below street level to maintain the City's character. A 1942 report,

which evaluated various alternatives, including relocation, recommended maintaining the tracks in their current location and lowering them below street level. The report estimated that lowering the tracks would cost $1.4 million. That same year, the Reno Chamber of Commerce endorsed the lowered tracks project as "A No. 1 civic improvement for the readjustment period after the war." Subsequent reports, prepared in 1944, 1968, 1972, 1976 and 1980, all further described the benefits to be obtained by lowering the tracks and updated the associated cost estimates.

In 1996, the United States Surface Transportation Board (STB) approved a merger between the Union Pacific Railroad Company (UP) and the Southern Pacific Railroad Company (SP). In evaluating the proposed merger, STB estimated that rail traffic through Reno would increase from twelve trains per day to as many as thirty-six trains per day by 2030 and determined that the increase would adversely impact ground transportation, pedestrian safety, service delivery systems and other environmental factors. STB identified Reno, Nevada, as one of two cities that would need special assistance to mitigate the adverse effects of increased traffic following the merger. Reno filed a lawsuit in federal court to prevent the merger.

On June 17, 1997, during negotiations with UP to develop a depressed trainway project to settle the dispute, the City Council passed a resolution declaring the depressed trainway project a priority for Reno. On December 1, 1998, Reno and UP reached a settlement and executed a Memorandum of Understanding (MOU) that cleared the way for construction of a railway trench through Reno. The MOU specified that UP would transfer real property, air rights and leases to Reno, and provide $15-17 million in engineering services, materials and labor to construct the trench, and that Reno would withdraw its appeal and petition STB jointly with UP to remove all restrictions on the number of trains that could pass through the city. Later that month, at UP and Reno's joint request, STB approved the MOU and made it a condition of the UP/SP merger. Reno and UP subsequently modified and amended the MOU, and extended its term to December 3, 2005.

In May 1999, Reno and the Nevada Department of Transportation began a federally-sponsored process to develop preliminary engineering, technical and environmental reports, which would be used to complete the mandatory Final Environmental Impact Statement (FEIS) for the project. The FEIS, which took eighteen months and $2 million to complete, identified twenty-six alternatives to ameliorate the adverse effects of train traffic through Reno. Five alternatives, including a "no-build" alternative, were chosen for further consideration, and in February 2001, the FHWA selected one of the alternatives as the best choice for the Reno Railroad Corridor: Alternative 5, a

Modified Extended Depressed Trainway in the current UP right-of-way. On February 27, 2001, the City Council approved Alternative 5 and directed city staff to take all necessary action to advance that alternative.

In April 2001, Reno formally solicited a Project Management Consultant for the ReTRAC project. In July 2001, the City Council awarded a $4.9 million contract to the Truckee Meadows ReTRAC Team to assist in various matters relating to engineering and design specifications, and the City began the design/build proposal process. In November 2001, the City Council selected four design/build team finalists and accepted the Project Management Consultant's project cost estimate review. In December 2001, the City Council approved $300,000 to reimburse unsuccessful design/build proposers, and on January 16, 2002, the City issued the final request for proposal. On July 16, 2002, the City Council selected Granite Construction Company's design/build proposal and decided to award Granite the construction contract. The City has until September 13, 2002, to give Granite Construction the "notice to proceed" with work on the project; after that, the City incurs a substantial penalty (about $15,000 per day), and if the notice to proceed is not issued by November 12, 2002, Granite Construction can raise its bid price or walk away from the project altogether.

The City Council, with county, state and federal assistance, has also developed comprehensive financing plans for the train trench project. Financing will come from numerous sources, some of which have been in place for several years:

1. A 1/8 cent countywide sales tax, which was authorized by the Nevada Legislature in 1997, was approved by the Washoe County Commission in 1998 and took effect April 1, 1999;

2. A 1 percent room tax increase within a specially designated district, which was authorized by the Nevada Legislature in 1997, was adopted by the City in 1998 and took effect January 1, 1999;

3. $115 million in revenue bonds and FHWA/DOT loans, which will be repaid from the countywide sales tax and 1 percent room tax;

4. State and federal grants;

5. UP contributions under the MOU;

6. Tax revenue from a Downtown Special Assessment District, which was created in November 1998; and

7. City of Reno general funds.

The tax proceeds, plus any interest and other income generated by it, must be used for "the cost of the acquisition, establishment, construction or expansion of one or more railroad grade separation projects," including the payment and prepayment of principal

and interest on notes, bonds or other obligations issued to fund such projects.[1]

*The initiative*

On January 23, 2002, the individual appellants filed with the City a Notice of Intent to circulate an initiative petition, which provides:

> The people of the City of Reno, of the State of Nevada, do enact as follows:
>
> The City of Reno shall not construct a depressed trainway (''train trench'') within the existing railroad right of way through the central portion of the City of Reno.

These five individuals formed Citizens for a Public Train Trench Vote, a political action committee organized to bring the train trench initiative to a public vote, and gathered almost 15,000 signatures on the petition.

On April 11, 2002, the trench opponents submitted the municipal initiative petition to the Reno City Clerk, who certified the petition's sufficiency on April 19, 2002.

The Reno City Council accepted the Clerk's certificate of sufficiency, declined to adopt the proposed ordinance and forwarded the initiative petition to the Registrar of Voters under NRS 295.215 for placement on the September 3, 2002 primary ballot. The City Council also directed the City Attorney to challenge the initiative's constitutionality in court.

*The litigation*

On May 6, 2002, the trench opponents filed a petition for judicial review or a writ of prohibition or injunctive relief, together with a motion for temporary restraining order and preliminary injunction, to stop the City from issuing the ReTRAC bonds. On May 9, 2002, the City moved to dismiss the petition, and filed a counterclaim for a declaratory judgment that the initiative is unconstitutional and for an injunction enjoining its placement on the ballot.

Also on May 9, 2002, a political action committee that supports the train trench, Citizens for Private Enterprise, and several pro-trench businesses, filed an application for writ of mandamus or complaint for declaratory and injunctive relief, seeking to prevent the initiative's placement on the ballot.

On June 3, 2002, the two cases were consolidated. The trench opponents moved for summary judgment against the City, and for dismissal against the trench supporters, on the basis that all lacked standing to challenge the initiative's validity. The City and the

---

[1]1997 Nev. Stat., ch. 506, § 24, at 2407.

trench supporters opposed the motions, and the district court denied them.

On June 6 and 7, 2002, the district court conducted a bench trial. During closing argument, counsel for the trench opponents conceded that the train trench is a public work project, which the City may undertake without passing an ordinance. Counsel also conceded that the initiative would be unconstitutional if it concerned an administrative, rather than a legislative, act and in that instance should be kept off the ballot. Counsel further conceded that the initiative would force the City to breach the MOU, which probably impairs the obligations of that contract.

On June 11, 2002, the district court entered an order denying the trench opponents' petition to prevent the bond sale. That order is not at issue on appeal.

On June 19, 2002, the district court entered findings of fact, conclusions of law and an order granting a declaratory judgment in favor of the City and the trench supporters, and permanently enjoining the Washoe County Registrar of Voters from placing the initiative on any city election ballot. The court ruled that the initiative is unconstitutional because it dictates an administrative decision to the City, which the people may not do through the initiative process, and because it would impair the obligation of contracts, in violation of Nevada Constitution Article 1, Section 15.

The trench opponents challenge the injunction and its basis. They assert that the voters have a constitutional right to propose and enact new laws through the initiative process, and contend that whether the initiative is administrative or legislative and whether it violates the constitution should be decided after the election.

## DISCUSSION

Initiative is the power of the people to propose and enact new laws.[2] The power is contained within Article 19, Section 2(1) of the Nevada Constitution: "[T]he people reserve to themselves the power to propose, by initiative petition, statutes and amendments to statutes and amendments to this constitution, and to enact or reject them at the polls." According to the Nevada Constitution, the initiative powers provided in Article 19 "are further reserved to the registered voters of each county and each municipality as to all local, special and municipal legislation of every kind in or for such county or municipality."[3] The initiative power applies

---

[2]*Forman v. Eagle Thrifty Drugs & Markets*, 89 Nev. 533, 537, 516 P.2d 1234, 1236 (1973).

[3]Nev. Const. art. 19, § 4.

only to legislation, however; it does not extend to administrative acts.[4]

*Legislative versus administrative acts*

Recently, in *Glover v. Concerned Citizens for Fuji Park,*[5] we discussed the principles for determining whether a municipal ordinance is legislative or administrative. We held that a permissible legislative ordinance is one that creates a permanent law or lays down a rule of conduct or course of policy for the guidance of the citizens or their officers. On the other hand, an impermissible administrative ordinance is one that simply puts into execution previously-declared policies or previously-enacted laws, or directs a decision that has been delegated to the local government.[6]

Other state courts have also drawn distinctions between legislative matters and administrative matters. The California Court of Appeal, for example, stated in *City of San Diego v. Dunkl*[7] that ''[t]he power to be exercised is legislative in its nature if it prescribes a new policy or plan; whereas, it is administrative in its nature if it merely pursues a plan already adopted by the legislative body itself, or some power superior to it.'' The *Dunkl* court explained further that acts constituting a declaration of public purpose, and making provisions for ways and means of its accomplishment, may be generally classified as calling for the exercise of legislative power; whereas, acts which are to be deemed as acts of administration, and classed among those governmental powers properly assigned to the executive department, are those which must be done to carry out legislative policies and purposes already declared by the legislative body, or which are inherent in its existence.[8]

The Wisconsin Court of Appeals drew a similar distinction in *Save Our Fire Department Paramedics v. City of Appleton,*[9] and added that ordinances relating to subjects of permanent and general character are regarded as legislative, whereas ordinances

---

[4]*Forman,* 89 Nev. at 537, 516 P.2d at 1236.

[5]118 Nev. 488, 50 P.3d 546 (2002).

[6]*Id.* at 494, 50 P.3d at 550.

[7]103 Cal. Rptr. 2d 269, 280 (Ct. App.) (quotations and emphasis omitted), *cert. denied,* 534 U.S. 892 (2001).

[8]*Id.*

[9]389 N.W.2d 43, 47-48 (Wis. Ct. App. 1986).

relating to subjects of temporary and special character are regarded as administrative.

The Oregon Supreme Court phrased the distinction slightly differently in *Foster v. Clark*,[10] stating that the distinction between legislative and administrative matters "is the distinction between making laws of general applicability and permanent nature, on the one hand, as opposed to decisions implementing such general rules, on the other."

From all of these cases and others like them, one overarching principle may be derived: regardless whether an initiative proposes enactment of a new statute or ordinance, or a new provision in a constitution or city charter, or an amendment to any of these types of laws, it must propose policy—it may not dictate administrative details.[11]

While courts draw similar distinctions, they are not entirely consistent about which category any particular type of measure fits within. In *Foster*,[12] the Oregon Supreme Court explains one reason why this is so, using the issue before it—whether naming or renaming a street is a legislative matter or an administrative matter—to demonstrate:

> A city's practice of naming or renaming streets only through specific ordinances may establish that the activity is "legislation" subject to the initiative and referendum process. Another city's practice of naming and renaming streets only through a process akin to that established for the City of Portland by [municipal ordinance] may establish that the activity is "administrative" and not subject to the initiative and referendum process. The point is, whether a particular municipal activity is "administrative" or is "legislation" often depends not on the nature of the action but the nature of the legal framework in which the action occurs.

Applying these principles, and considering the legal framework within which the train trench initiative was proposed, we conclude that the initiative is not legislation. The initiative does not estab-

[10]790 P.2d 1, 6 (Or. 1990).

[11]The initiative petition did not specify that it was proposing the enactment of an ordinance, but counsel for the initiative proponents characterized it that way.

[12]790 P.2d at 7.

lish a new course of policy to guide Reno's citizens or their officers regarding the choice of public work projects in general or railroad grade separation projects in particular, and it does not declare any public purpose or make any provisions for accomplishing it. Instead, the initiative prohibits the construction of a particular public work project, the train trench, in a particular location, the existing right of way through the city. The initiative does not prohibit the construction of a train trench in general, or the construction of a different type of grade separation project within the right of way. The initiative relates to a subject of very special character, not one of general character.

The authority to undertake public work projects has been legislatively delegated to local governments by statute.[13] And although Reno must comply with various state and federal statutes governing public works, no regulation requires it to take legislative action or obtain voter approval before commencing a local improvement or public work project. To the contrary, NRS 271.265 specifically authorizes cities, without any election, to acquire, improve, equip, operate and maintain various local improvement projects, including overpass, underpass, street and transportation projects, and any combination of these projects. Similarly, the Reno City Charter, section 6.010, permits the City Council, without any election, to acquire, improve, equip, operate and maintain, convert to or authorize various local improvement projects, including overpass, underpass and street projects.

The trench opponents argue that the ReTRAC project is not an underpass project as contemplated in these laws, because NRS 271.245 defines an "underpass project" as "any tunnel, tube or other structure or facilities for the transportation of pedestrians, motor and other vehicles, and utility lines," and NRS 482.135 defines "vehicle" in a manner that excludes trains. The argument is not persuasive because the NRS 482.135 definition of "vehicle" is limited to that chapter, and the trench opponents have provided no reason for grafting it into NRS chapter 271. But even if the ReTRAC project could not be considered an underpass project, it fits within the other project descriptions and qualifies as a local improvement project authorized by NRS 271.265 and the City Charter.

In addition, although they conceded in the district court that the train trench is a public work project, the trench opponents now assert that it is not—because the train track property is owned by the railroad, not the City, and because the train trench is not within NRS 338.010(11)'s definition of "public work." The trench opponents' new assertion is without merit. UP agreed in

---

[13]*See* NRS chapter 338 (public works projects); *see also* NRS chapter 271 (local improvements).

the MOU to transfer the real property upon which the trench will be located to the City. NRS 338.010(11) defines "public work" to include "any project for the new construction, repair or reconstruction of: (a) A project financed in whole or in part from public money for: . . . (5) Public streets and alleys; . . . and (10) All other publicly owned works and property whose cost as a whole exceeds \$20,000." The train trench fits within the NRS 338.010(11)(a)(5) and (10) definitions. We conclude that the grade separation project is a public work and that the choice of the train trench as the best way to execute the project is an administrative decision to be made by the Reno City Council, not the electorate.[14]

## Pre-election intervention

In *Fuji Park,*[15] we resolved the question whether pre-election judicial intervention is warranted when an initiative petition improperly proposes an administrative measure, or otherwise exceeds the electorate's power; we held that pre-election intervention is warranted because an initiative that fails to meet the threshold requirement that it propose only legislation is void.

## Substantive validity and standing

We need not reach the question whether the train trench initiative, if enacted, would violate the contract clause or any other provision in the state constitution. Nevertheless, we note that when a proposed initiative meets all threshold procedural requirements, pre-election review of substantive challenges is not generally permitted,[16] unless the proposed initiative is patently, or plainly and palpably, unconstitutional.[17]

---

[14]We note that although the dissent raises some interesting points with respect to the train trench project, it does not address the legal issues that we are called upon to decide.

[15]118 Nev. at 498-99, 50 P.3d at 552-53.

[16]*Hessey v. Burden,* 615 A.2d 562, 572-74 (D.C. 1992) (reviewing various states' cases regarding pre-election challenges to the validity of proposed initiatives); *see* James D. Gordon III & David B. Magleby, *Pre-election Judicial Review of Initiatives and Referendums,* 64 Notre Dame L. Rev. 298 (1989); *see also Las Vegas Chamber of Commerce v. Del Papa,* 106 Nev. 910, 802 P.2d 1280 (1990) (noting that this court had always strictly limited its pre-election intervention to cases involving violations of state constitutional or statutory rules governing the procedures for placing initiatives and referendums on the ballot, and declining to enjoin an initiative that, if enacted, could later be held unconstitutional).

[17]*Hessey,* 615 A.2d at 573; *see Stumpf v. Lau,* 108 Nev. 826, 839 P.2d 120 (1992) (holding that this court may enjoin a ballot question that, if enacted, would constitute a plain and palpable violation of the United States Constitution and would be inoperative under any circumstances or conditions).

We also need not reach the question whether the non-governmental respondents have standing to challenge the initiative's validity, because the City's standing was clearly sufficient to sustain the action.[18]

## CONCLUSION

We conclude that the initiative prohibiting construction of a train trench within the existing right of way through downtown Reno exceeds the electorate's initiative power because it concerns an administrative rather than a legislative act. Accordingly, we affirm the district court order permanently enjoining the Washoe County Registrar of Voters from placing the train trench initiative on any city election ballot.[19]

YOUNG, J., dissenting:

I respectfully dissent.

Nevada's Constitution expressly reserves the right of the people to propose initiative petitions "as to all local, special and municipal legislation of every kind."[1] The scope of this right is broad.[2] This provision was added to our constitution to enable voters to directly enact legislation when public officials are not responsive to public concerns.[3]

Here, nearly 15,000 Reno voters signed a petition to place an initiative measure regarding the train trench project on the ballot. The City Clerk certified that the petition met procedural requirements, and the Council forwarded the petition to the Registrar of Voters to be put on the ballot. I submit the initiative petition is valid and would allow the voices of the people to be heard.

---

[18]*See In re Ballot Title 1999-2000 No. 215,* 3 P.3d 11, 14 (Colo. 2000) (choosing not to address an association's standing when its arguments were identical to those of a registered elector with standing); *Mazzone v. Attorney General,* 736 N.E.2d 358, 363 n.4 (Mass. 2000) (noting that it had often chosen not to reach the question of organizational or official standing when the standing of the individual voters was sufficient to sustain the action).

[19]THE HONORABLE A. WILLIAM MAUPIN, Chief Justice, and THE HONORABLE NANCY BECKER, Justice, voluntarily recused themselves from participation in the decision of this matter.

[1]Nev. Const. art. 19, § 4.

[2]*Forman v. Eagle Thrifty Drugs & Markets,* 89 Nev. 533, 537, 516 P.2d 1234, 1236 (1973).

[3]*See Wilson v. Koontz,* 76 Nev. 33, 36-37, 348 P.2d 231, 232 (1960) (stating that this provision was designed to empower people "to enact or reject" laws independent of the legislature); Hugh A. Bone, *The Initiative and The Referendum* 5 (2d ed. 1975) ("[A]s an alternative to legislative unresponsiveness, the initiative and referenda were to give the citizen the means to protest specific policy grievances, and to implement on a collective basis those programs deemed desirable by the majority.").

However, the City seeks to prevent a public vote and challenges the constitutionality of the initiative. A reasonable inference to be drawn from this action is that the City has a concern that a public vote on the project would be adverse to the City's plans.[4] We live in a country where the right to vote is fundamental to our way of life.[5] There may be no purer form of a democracy "of the people, by the people, [and] for the people"[6] than when an issue is decided by a public vote.

Clearly, not every government action can be subject to a vote. The pace at which a democratic government moves is frequently slow. The practical problems arising from a direct form of democracy on every issue would be overwhelming. Some issues are undoubtedly best resolved by elected officials. We are faced with competing interests: "that of protecting government from unwarranted harassment and the equal interest in protecting benefits to be won through direct legislation."[7]

It is argued that we have established an administrative-legislative test for determining when an issue falls within the traditional discretion afforded to public officials.[8] As the majority notes, only decisions considered legislative in nature are subject to a direct vote by the people. The majority concludes that the City's decision to proceed with the trench project is purely administrative; therefore, any initiative proposal is barred. We have previously stated that the administrative-legislative distinction is "often vague."[9] In my view, the decision of the City to proceed with the project does not neatly fit into the administrative category.

On one hand, although the railroad has operated above ground in Reno for over 130 years, the legislature recently concluded that there are traffic problems created by the above ground railroad.[10] Clearly, the City has the authority to complete various local improvement projects, including overpasses, underpasses, and street and transportation projects.[11] However, the trench project constitutes more than a mere local improvement, public work, or transportation project. Rather, the trench project is a part of an

---

[4]It is troubling that the City recently entered into a $170 million contract for the project while the initiative issue remained unresolved. This action seems premature and somewhat suggestive of a "be-reasonable-do-it-our-way" attitude on the part of the City.

[5]*See Bush v. Gore,* 531 U.S. 98, 104 (2000).

[6]Abraham Lincoln, Address at Dedication of National Cemetery at Gettysburg (Nov. 19, 1863).

[7]*Forman,* 89 Nev. at 537, 516 P.2d at 1236.

[8]*Id.*

[9]*Id.*

[10]*See* 1997 Nev. Stat., ch. 506, § 23, at 2405.

[11]*See* NRS 271.265; NRS 338.010; Reno City Charter § 6.010.

economic policy to revitalize the downtown area that involves both a permanent change to the character of the City and the largest single financial commitment in its history. This suggests that the project is not merely administrative but policy driven and legislative in nature.

The decision to proceed with the train trench project constitutes a decision unlike any the City has ever before made. It is unique in the financial burden it will impose on the taxpayers, possibly for generations to come.[12] The City estimates that the project will cost an additional $260 million. To many observers, this figure appears to be conservative. The City has acknowledged that project expenses could run much higher, as the builders have a design and build contract. It thus appears that the builders have what almost amounts to a blank check. The City concedes that it has already spent $15 million on the project, including $300,000 to reimburse *unsuccessful* design/build proposers. The City is now poised to spend projected tax revenue—and probably more—on what it refers to as a transportation project. We should perhaps be thankful that City visionaries of long ago did not see a need to make an expensive and long-term commitment to a transportation system designed largely for horses and wagons.

The cost of this single project is more than the City's total 1999-2000 annual budget.[13] The funds to pay for this project will be derived from various sources, including money from room and sales taxes, grants, bonds, loans, and the City's general fund, and bonded indebtedness will be repaid over a period of forty years. The magnitude of this undertaking is more than a mere administrative decision by the City's elected officials.

The ramifications of this project may be long-lasting. What if the project does not rise to the level of expectations for success? We should not forget the lessons of the Lincoln County "Million Dollar Courthouse."[14]

In 1871, elected officials of then-thriving Lincoln County rushed to build a courthouse and jail for a total cost of $26,400.[15] A construction contract was entered into with a reputable builder, but by the time the courthouse was completed just a year later,

---

[12]This case is distinguishable from our recent decision in *Glover v. Concerned Citizens for Fuji Park,* 118 Nev. 488, 495-96, 50 P.3d 546, 550-51 (2002). There, the issue involved Carson City's use and management of real property under authority granted to it by statute and the city charter. Such land use decisions are traditionally administrative in nature and do not possess the unique policy and financial aspects present here.

[13]Judicial notice is taken that the actual budget of the City for 1999-2000 was $243,944,393.

[14]Ronald M. James, *Temples of Justice: County Courthouses of Nevada* 99-100 (University of Nevada Press 1994).

[15]*Id.* at 100.

costs had nearly tripled and totaled $75,000.[16] During the following years, the economic boom in Lincoln County declined, while the interest on the debt mounted.[17] Not until 1938, sixty-six years later, were the people of Lincoln County able to pay bonds used to finance the project.[18] By that time, the estimated cost of the project had reached over $800,000.[19] The courthouse became "famous for the county's inept financing," resulting in a nearly seven figure debt.[20] In serious need of repair, the courthouse was closed in the 1930s, just as the bonds were finally paid—"a fitting commentary on how badly the county handled the situation."[21]

If the same ratio between contract price and actual cost in the Lincoln County Courthouse case occurs here, it is not totally unforeseeable that Reno's $282 million[22] project could be called the "Billion Dollar Train Trench."[23] The economic future of Northern Nevada is far from settled. Where will the City get the money to pay for this project if tax revenue decreases further? Competition from gaming on Native American reservations in nearby states poses a threat to tax income. Should we place a high-stakes bet on a project that effectively amounts to a gamble on Reno's economic future?

The answers to these questions are uncertain and lead to troubling conclusions. During current economic uncertainty, when our state is facing a sizable budget shortfall, it is apparent that thousands of voters who signed petitions are hesitant to support the trench project.

Funds used for the project could assist in building schools and parks and employ countless teachers and police officers. In budget year 1999-2000, the City spent $45,099,788 on police and $17,273,986 on parks and recreation. These figures are a mere fraction of the cost of the train project. If the City desires to improve the economy of the downtown area, the place to start may

---

[16]*Id.*

[17]*Id.*

[18]*Id.*

[19]*Id.* at 102.

[20]*Id.* at 99-100.

[21]*Id.*

[22]Susan Voyles, *Rigdon Tells Forum New Council Might Stop Trench,* Reno Gazette-Journal, Aug. 16, 2002, at 1C.

[23]I am reminded of a quote attributed to former United States Senator Everett M. Dirksen from Illinois during debate on an appropriation bill: "A billion here, a billion there, and pretty soon you're talking about real money." *Respectfully Quoted: A Dictionary of Quotations Requested from the Congressional Research Service* 155 (Suzy Platt ed., Library of Congress 1989).

be by making it both more safe and attractive. Instead, the City seeks to build a quarter of a billion dollar trench through which private trains will pass. If the project fails, the impact may have financial consequences not only for the City, but the entire region as well. It seems only fair that citizens who ultimately will bear the financial burden be allowed to vote on it.

We teach our children and constantly remind our fellow citizens that voting is a civic responsibility. Yet, when an issue such as the one at hand sparks voter interest, the City argues that voting is impermissible. This result is difficult to justify. If not here, then when and under what circumstances does our constitution allow initiative petitions?

Enormous financial commitments should not be left only to the unfettered discretion of public officials. A tenet of democracy is that people generally sense what is in their best interests, although sometimes it appears that politicians, for a variety of reasons, may believe otherwise.[24] Whether the train trench project would be approved by the people, we will never know. Their voices have been silenced on the dubious premise that the $282 million decision to proceed on by far the most costly project in the history of the city (which may take nearly a half century to pay off) is merely an ''administrative'' matter and not appropriate for voters to consider. One thing, however, is certain: the old adage of ''being railroaded'' may be aptly applied to the situation confronting the residents of Washoe County today.

---

[24]Should the isolated voice of one council person dictate the long-term economic future of the citizens of Washoe County? Here, a nearly $300 million project proceeds based on a 4-3 vote by the Council, despite a unanimous decision by County Commissioners to allow the citizens to vote. Hearing before the Washoe County Board of Commissioners (July 9, 2002); Hearing before the Reno City Council (July 16, 2002).